DAVIS *v.* UNITED STATES

No. 92–1949.   Argued March 29, 1994—Decided June 24, 1994

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 462. SOUTER, J., filed an opinion concurring in the judgment, in which BLACKMUN, STEVENS, and GINSBURG, JJ., joined, *post*, p. 466.

*David S. Jonas* argued the cause for petitioner. With him on the briefs were *Philip L. Sundel, Daniel S. Jonas,* and *David Rudovsky.*

*Richard H. Seamon* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Harris, Deputy Solicitor General Bryson, Joel M. Gershowitz, Theodore G. Hess,* and *Brett D. Barkey.**

---

*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Richard M. Weintraub, William C. O'Malley,* and *Bernard J. Farber* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the National Association of Criminal Defense Lawyers by *Janet E. Ainsworth;* and for the Washington Legal Foundation et al. by *Paul G. Cassell, Daniel J. Popeo,* and *Paul D. Kamenar.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In *Edwards* v. *Arizona,* 451 U. S. 477 (1981), we held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. In this case we decide how law enforcement officers should respond when a suspect makes a reference to counsel that is insufficiently clear to invoke the *Edwards* prohibition on further questioning.

I

Pool brought trouble—not to River City, but to the Charleston Naval Base. Petitioner, a member of the United States Navy, spent the evening of October 2, 1988, shooting pool at a club on the base. Another sailor, Keith Shackleton, lost a game and a $30 wager to petitioner, but Shackleton refused to pay. After the club closed, Shackleton was beaten to death with a pool cue on a loading dock behind the commissary. The body was found early the next morning.

The investigation by the Naval Investigative Service (NIS) gradually focused on petitioner. Investigative agents determined that petitioner was at the club that evening, and that he was absent without authorization from his duty station the next morning. The agents also learned that only privately owned pool cues could be removed from the club premises, and that petitioner owned two cues—one of which had a bloodstain on it. The agents were told by various people that petitioner either had admitted committing the crime or had recounted details that clearly indicated his involvement in the killing.

On November 4, 1988, petitioner was interviewed at the NIS office. As required by military law, the agents advised petitioner that he was a suspect in the killing, that he was not required to make a statement, that any statement could be used against him at a trial by court-martial, and that he was entitled to speak with an attorney and have an attorney present during questioning. See Art. 31, Uniform Code of

Military Justice (UCMJ), 10 U. S. C. § 831; Mil. Rule Evid. 305; Manual for Courts-Martial A22–13 (1984). Petitioner waived his rights to remain silent and to counsel, both orally and in writing.

About an hour and a half into the interview, petitioner said, "Maybe I should talk to a lawyer." App. 135. According to the uncontradicted testimony of one of the interviewing agents, the interview then proceeded as follows:

> "[We m]ade it very clear that we're not here to violate his rights, that if he wants a lawyer, then we will stop any kind of questioning with him, that we weren't going to pursue the matter unless we have it clarified is he asking for a lawyer or is he just making a comment about a lawyer, and he said, [']No, I'm not asking for a lawyer,' and then he continued on, and said, 'No, I don't want a lawyer.'" *Id.*, at 136.

After a short break, the agents reminded petitioner of his rights to remain silent and to counsel. The interview then continued for another hour, until petitioner said, "I think I want a lawyer before I say anything else." *Id.*, at 137. At that point, questioning ceased.

At his general court-martial, petitioner moved to suppress statements made during the November 4 interview. The Military Judge denied the motion, holding that "the mention of a lawyer by [petitioner] during the course of the interrogation [was] not in the form of a request for counsel and . . . the agents properly determined that [petitioner] was not indicating a desire for or invoking his right to counsel." *Id.*, at 164. Petitioner was convicted on one specification of unpremeditated murder, in violation of Art. 118, UCMJ, 10 U. S. C. § 918. He was sentenced to confinement for life, a dishonorable discharge, forfeiture of all pay and allowances, and a reduction to the lowest pay grade. The convening authority approved the findings and sentence. The Navy-

Marine Corps Court of Military Review affirmed. App. to Pet. for Cert. 12a–15a.

The United States Court of Military Appeals granted discretionary review and affirmed. 36 M. J. 337 (1993). The court recognized that the state and federal courts have developed three different approaches to a suspect's ambiguous or equivocal request for counsel:

> "Some jurisdictions have held that any mention of counsel, however ambiguous, is sufficient to require that all questioning cease. Others have attempted to define a threshold standard of clarity for invoking the right to counsel and have held that comments falling short of the threshold do not invoke the right to counsel. Some jurisdictions . . . have held that all interrogation about the offense must immediately cease whenever a suspect mentions counsel, but they allow interrogators to ask narrow questions designed to clarify the earlier statement and the [suspect's] desires respecting counsel." *Id.*, at 341 (internal quotation marks omitted).

Applying the third approach, the court held that petitioner's comment was ambiguous, and that the NIS agents properly clarified petitioner's wishes with respect to counsel before continuing questioning him about the offense. *Id.*, at 341–342.

Although we have twice previously noted the varying approaches the lower courts have adopted with respect to ambiguous or equivocal references to counsel during custodial interrogation, see *Connecticut* v. *Barrett*, 479 U. S. 523, 529–530, n. 3 (1987); *Smith* v. *Illinois*, 469 U. S. 91, 96, n. 3 (1984) *(per curiam)*, we have not addressed the issue on the merits. We granted certiorari, 510 U. S. 942 (1993), to do so.

## II

The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings, see *United*

*States* v. *Gouveia*, 467 U. S. 180, 188 (1984), and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel. Nevertheless, we held in *Miranda* v. *Arizona*, 384 U. S. 436, 469–473 (1966), that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. The right to counsel established in *Miranda* was one of a "series of recommended 'procedural safeguards' . . . [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Michigan* v. *Tucker*, 417 U. S. 433, 443–444 (1974); see U. S. Const., Amdt. 5 ("No person . . . shall be compelled in any criminal case to be a witness against himself").*

---

*We have never had occasion to consider whether the Fifth Amendment privilege against self-incrimination, or the attendant right to counsel during custodial interrogation, applies of its own force to the military, and we need not do so here. The President, exercising his authority to prescribe procedures for military criminal proceedings, see Art. 36(a), UCMJ, 10 U. S. C. § 836(a), has decreed that statements obtained in violation of the Self-Incrimination Clause are generally not admissible at trials by court-martial. Mil. Rules Evid. 304(a) and (c)(3). Because the Court of Military Appeals has held that our cases construing the Fifth Amendment right to counsel apply to military interrogations and control the admissibility of evidence at trials by court-martial, see, *e. g.*, *United States* v. *McLaren*, 38 M. J. 112, 115 (1993); *United States* v. *Applewhite*, 23 M. J. 196, 198 (1987), and the parties do not contest this point, we proceed on the assumption that our precedents apply to courts-martial just as they apply to state and federal criminal prosecutions.

We also note that the Government has not sought to rely in this case on 18 U. S. C. § 3501, "the statute governing the admissibility of confessions in federal prosecutions," *United States* v. *Alvarez-Sanchez*, 511 U. S. 350, 351 (1994), and we therefore decline the invitation of some *amici* to consider it. See Brief for Washington Legal Foundation et al. as *Amici Curiae* 7–14. Although we will consider arguments raised only in an *amicus* brief, see *Teague* v. *Lane*, 489 U. S. 288, 300 (1989) (plurality opinion), we are reluctant to do so when the issue is one of first impression involving

The right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations, we have held, that it "requir[es] the special protection of the knowing and intelligent waiver standard." *Edwards* v. *Arizona,* 451 U. S., at 483. See *Oregon* v. *Bradshaw,* 462 U. S. 1039, 1046–1047 (1983) (plurality opinion); *id.,* at 1051 (Powell, J., concurring in judgment). If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. *North Carolina* v. *Butler,* 441 U. S. 369, 372–376 (1979). But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Edwards* v. *Arizona, supra,* at 484–485. This "second layer of prophylaxis for the *Miranda* right to counsel," *McNeil* v. *Wisconsin,* 501 U. S. 171, 176 (1991), is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan* v. *Harvey,* 494 U. S. 344, 350 (1990). To that end, we have held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present. *Minnick* v. *Mississippi,* 498 U. S. 146 (1990); *Arizona* v. *Roberson,* 486 U. S. 675 (1988). "It remains clear, however, that this prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." *Connecticut* v. *Barrett, supra,* at 528.

The applicability of the " 'rigid' prophylactic rule" of *Edwards* requires courts to "determine whether the accused *actually invoked* his right to counsel." *Smith* v. *Illinois, supra,* at 95 (emphasis added), quoting *Fare* v. *Michael C.,* 442 U. S. 707, 719 (1979). To avoid difficulties of proof and to

the interpretation of a federal statute on which the Department of Justice expressly declines to take a position. See Tr. of Oral Arg. 44–47.

provide guidance to officers conducting interrogations, this is an objective inquiry. See *Connecticut* v. *Barrett, supra,* at 529. Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil* v. *Wisconsin,* 501 U. S., at 178. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. See *ibid.* ("[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*"); *Edwards* v. *Arizona, supra,* at 485 (impermissible for authorities "to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel") (emphasis added).

Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith* v. *Illinois,* 469 U. S., at 97–98 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don," *post,* at 476 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. See *Moran* v. *Burbine,* 475 U. S. 412, 433, n. 4 (1986) ("[T]he interrogation must cease until an attorney is present *only* [i]f the individual states that he wants an attorney") (citations and internal quotation marks omitted).

We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. See *Arizona* v. *Roberson, supra,* at 688

(KENNEDY, J., dissenting) ("[T]he rule of *Edwards* is our rule, not a constitutional command; and it is our obligation to justify its expansion"). The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity," *Michigan* v. *Mosley*, 423 U. S. 96, 102 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in *Edwards* requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer. In *Miranda* itself, we expressly rejected the suggestion "that each police station must have a 'station house lawyer' present at all times to advise prisoners," 384 U. S., at 474, and held instead that a suspect must be told of his right to have an attorney present and that he may not be questioned after invoking his right to counsel. We also noted that if a suspect is "indecisive in his request for counsel," the officers need not always cease questioning. See *id.*, at 485.

We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Moran* v. *Burbine, supra,* at 427. A suspect who knowingly and voluntarily waives his right to counsel after having that right explained

to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect.

In considering how a suspect must invoke the right to counsel, we must consider the other side of the *Miranda* equation: the need for effective law enforcement. Although the courts ensure compliance with the *Miranda* requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a suspect. The *Edwards* rule—questioning must cease if the suspect asks for a lawyer—provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.

Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case. Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's state-

ment is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

The courts below found that petitioner's remark to the NIS agents—"Maybe I should talk to a lawyer"—was not a request for counsel, and we see no reason to disturb that conclusion. The NIS agents therefore were not required to stop questioning petitioner, though it was entirely proper for them to clarify whether petitioner in fact wanted a lawyer. Because there is no ground for suppression of petitioner's statements, the judgment of the Court of Military Appeals is

*Affirmed.*

JUSTICE SCALIA, concurring.

Section 3501 of Title 18 of the United States Code is "the statute governing the admissibility of confessions in federal prosecutions." *United States* v. *Alvarez-Sanchez*, 511 U. S. 350, 351 (1994). That provision declares that "a confession . . . *shall be admissible in evidence if it is voluntarily given,*" and that the issue of voluntariness shall be determined on the basis of "*all* the circumstances surrounding the giving of the confession, *including* whether or not [the] defendant was advised or knew that he was not required to make any statement . . . [;] . . . whether or not [the] defendant had been advised prior to questioning of his right to the assistance of counsel; and . . . whether or not [the] defendant was without the assistance of counsel when questioned . . . ."

§§ 3501(a), (b) (emphases added). It continues (lest the import be doubtful): "The presence or absence of any of the above-mentioned factors . . . need not be conclusive on the issue of voluntariness of the confession." § 3501(b). Legal analysis of the admissibility of a confession without reference to these provisions is equivalent to legal analysis of the admissibility of hearsay without consulting the Rules of Evidence; it is an unreal exercise. Yet as the Court observes, see *ante*, at 457–458, n., that is precisely what the United States has undertaken in this case. It did not raise § 3501(a) below and asserted that it is "not at issue" here, Brief for United States 18, n. 13.*

This is not the first case in which the United States has declined to invoke § 3501 before us—nor even the first case in which that failure has been called to its attention. See Tr. of Oral Arg. in *United States* v. *Green*, O. T. 1992, No. 91–1521, pp. 18–21. In fact, with limited exceptions the

---

*The United States makes the unusually self-denying assertion that the provision "in any event would appear not to be applicable in court-martial cases" since (1) court-martial cases are not "'criminal prosecutions'" within the meaning of the Sixth Amendment and "therefore would not appear to be 'criminal prosecution[s]' for purposes of Section 3501(a)," and (2) courts-martial are governed by Article 31 of the Uniform Code of Military Justice, 10 U. S. C. § 831, and Rules 304 and 305 of the Military Rules of Evidence. The first point seems to me questionable: The meaning of terms in statutes does not necessarily parallel their meaning in the Constitution. Moreover, even accepting the premise that § 3501 does not apply to courts-martial directly, it does apply indirectly, through Rule 101(b)(1) of the Military Rules of Evidence, which requires courts-martial to apply "the rules of evidence generally recognized in the trial of criminal cases in the United States district courts." As for the second point: The cited provisions of the Uniform Code and the Military Rules may (though I doubt it) be independent reasons why the confession here should be excluded, but they cannot *possibly* be reasons why § 3501 does not prevent *Miranda* v. *Arizona*, 384 U. S. 436 (1966), from being a basis for excluding them, which is the issue before us. In any event, the Court today bases its refusal to consider § 3501 not upon the fact that the provision is inapplicable, but upon the fact that the Government failed to argue it—and it is *that* refusal which my present statement addresses.

provision has been studiously avoided by every Administration, not only in this Court but in the lower courts, since its enactment more than 25 years ago. See Office of Legal Policy, U. S. Dept. of Justice, Report to Attorney General on Law of Pre-Trial Interrogation 72–73 (1986) (discussing "[t]he abortive implementation of § 3501" after its passage in 1968).

I agree with the Court that it is *proper*, given the Government's failure to raise the point, to render judgment without taking account of § 3501. But the refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary. See *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 445–448 (1993) (proper for Court of Appeals to consider whether an allegedly controlling statute had been repealed, despite parties' failure, upon invitation, to assert the point). As far as I am concerned, such a time will have arrived when a case that comes within the terms of this statute is next presented to us.

For most of this century, voluntariness *vel non* was the touchstone of admissibility of confessions. See *Miranda* v. *Arizona*, 384 U. S. 436, 506–507 (1966) (Harlan, J., dissenting). Section 3501 of Title 18 *seems* to provide for that standard in federal criminal prosecutions today. I say "seems" because I do not wish to prejudge any issue of law. I am entirely open to the argument that § 3501 does not mean what it appears to say; that it is inapplicable for some other reason; or even that it is unconstitutional. But I will no longer be open to the argument that this Court should continue to ignore the commands of § 3501 simply because the Executive declines to insist that we observe them.

The Executive has the power (whether or not it has the right) effectively to nullify some provisions of law by the mere failure to prosecute—the exercise of so-called prosecutorial discretion. And it has the power (whether or not it

has the right) to avoid application of § 3501 by simply declining to introduce into evidence confessions admissible under its terms. But once a prosecution has been commenced and a confession introduced, the Executive assuredly has neither the power nor the right to determine what objections to admissibility of the confession are valid in law. Section § 3501 of Title 18 is a provision of law directed *to the courts*, reflecting the people's assessment of the proper balance to be struck between concern for persons interrogated in custody and the needs of effective law enforcement. We shirk our duty if we systematically disregard that statutory command simply because the Justice Department systematically declines to remind us of it.

The United States' repeated refusal to invoke § 3501, combined with the courts' traditional (albeit merely prudential) refusal to consider arguments not raised, has caused the federal judiciary to confront a host of *"Miranda"* issues that might be entirely irrelevant under federal law. See, *e. g.*, in addition to the present case, *United States* v. *Green*, 507 U. S. 545 (1993) (dism'g cert. as moot); *United States* v. *Griffin*, 922 F. 2d 1343 (CA8 1990); *United States* v. *Vazquez*, 857 F. 2d 857 (CA1 1988); *United States* v. *Scalf*, 725 F. 2d 1272 (CA10 1984). Worse still, it may have produced—during an era of intense national concern about the problem of runaway crime—the acquittal and the nonprosecution of many dangerous felons, enabling them to continue their depredations upon our citizens. There is no excuse for this. Perhaps (though I do not immediately see why) the Justice Department has good basis for believing that allowing prosecutions to be defeated on grounds that could be avoided by invocation of § 3501 is consistent with the Executive's obligation to "take Care that the Laws be faithfully executed," U. S. Const., Art. II, § 3. That is not the point. The point is whether *our* continuing refusal to *consider* § 3501 is consistent with the Third Branch's obligation to decide according to the law. I think it is not.

JUSTICE SOUTER, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE GINSBURG join, concurring in the judgment.

In the midst of his questioning by naval investigators, petitioner said "Maybe I should talk to a lawyer." The investigators promptly stopped questioning Davis about the killing of Keith Shackleton and instead undertook to determine whether he meant to invoke his right to counsel, see *Miranda* v. *Arizona*, 384 U. S. 436 (1966). According to testimony accepted by the courts below, Davis answered the investigators' questions on that point by saying, "I'm not asking for a lawyer," and "No, I don't want to talk to a lawyer." Only then did the interrogation resume (stopping for good when petitioner said, "I think I want a lawyer before I say anything else").

I agree with the majority that the Constitution does not forbid law enforcement officers to pose questions (like those directed at Davis) aimed solely at clarifying whether a suspect's ambiguous reference to counsel was meant to assert his Fifth Amendment right. Accordingly I concur in the judgment affirming Davis's conviction, resting partly on evidence of statements given after agents ascertained that he did not wish to deal with them through counsel. I cannot, however, join in my colleagues' further conclusion that if the investigators here had been so inclined, they were at liberty to disregard Davis's reference to a lawyer entirely, in accordance with a general rule that interrogators have no legal obligation to discover what a custodial subject meant by an ambiguous statement that could reasonably be understood to express a desire to consult a lawyer.

Our own precedent, the reasonable judgments of the majority of the many courts already to have addressed the issue before us,[1] and the advocacy of a considerable body of law

---

[1] See, *e. g.*, *United States* v. *Porter*, 776 F. 2d 370 (CA1 1985) (en banc); *United States* v. *Gotay*, 844 F. 2d 971, 975 (CA2 1988); *Thompson* v. *Wainwright*, 601 F. 2d 768, 771–772 (CA5 1979) (en banc); *United States* v. *Fouche*, 833 F. 2d 1284, 1287 (CA9 1987); *United States* v. *March*, 999 F. 2d

enforcement officials[2] are to the contrary. All argue against the Court's approach today, which draws a sharp line between interrogated suspects who "clearly" assert their right to counsel, *ante*, at 461, and those who say something that may, but may not, express a desire for counsel's presence, the former suspects being assured that questioning will not resume without counsel present, see *Miranda, supra*, at 474, *Edwards* v. *Arizona*, 451 U. S. 477, 484–485 (1981); *Minnick* v. *Mississippi*, 498 U. S. 146 (1990), the latter being left to fend for themselves. The concerns of fairness and practicality that have long anchored our *Miranda* case law point to a different response: when law enforcement officials "reasonably do not know whether or not the suspect wants a lawyer," *ante*, at 460, they should stop their interrogation and ask him to make his choice clear.

I

A

While the question we address today is an open one,[3] its answer requires coherence with nearly three decades of case

456, 461–462 (CA10 1993); *United States* v. *Mendoza-Cecelia*, 963 F. 2d 1467, 1472 (CA11 1992); see also *Howard* v. *Pung*, 862 F. 2d 1348 (CA8 1988). The weight of state-court authority is similarly lopsided, see, *e. g.*, *People* v. *Benjamin*, 732 P. 2d 1167, 1171 (Colo. 1987); *Crawford* v. *State*, 580 A. 2d 571, 576–577 (Del. 1990); *Martinez* v. *State*, 564 So. 2d 1071, 1074 (Fla. 1990); *State* v. *Robinson*, 427 N. W. 2d 217, 223 (Minn. 1988).

[2] See Brief for Americans for Effective Law Enforcement, Inc., International Association of Chiefs of Police, Inc., National District Attorneys Association, and National Sheriffs' Association as *Amici Curiae* 5 (The approach advocated here "is a common sense resolution of the problem. It fully accommodates the rights of the subject, while at the same time preserv[ing] the interests of law enforcement and of the public welfare"); see also Brief for United States 20 (approach taken by the Court does not "fulfill the fundamental purpose of *Miranda*") (internal quotation marks omitted).

[3] The majority acknowledges, *ante*, at 456, that we have declined (despite the persistence of divergent approaches in the lower courts) to decide the operative rule for such ambiguous statements, see, *e. g.*, *Connecticut* v. *Barrett*, 479 U. S. 523, 529, n. 3 (1987); *Mueller* v. *Virginia*, 507 U. S. 1043

law addressing the relationship between police and criminal suspects in custodial interrogation. Throughout that period, two precepts have commanded broad assent: that the

---

(1993) (White, J., dissenting from denial of certiorari), but then suggests that the conclusion it reaches was foreshadowed by *McNeil* v. *Wisconsin,* 501 U. S. 171 (1991), where we noted that the "*likelihood*" that a suspect would wish counsel to be present" was not dispositive, *id.,* at 178. But we were not addressing the degree of clarity required to activate the counsel right (let alone endorsing the standard embraced today), as is evident from the very page of *McNeil* cited, where we were careful to say only that the *Miranda* counsel right "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." 501 U. S., at 178. *McNeil* instead made the different and familiar point that courts may not presume that a silent defendant "would" want a lawyer whenever circumstances suggest that representation "would" be in his interest.

Nor may this case be disposed of by italicizing the words of *Edwards* v. *Arizona,* 451 U. S. 477, 485 (1981), to the effect that when a suspect "clearly assert[s]" his right, questioning must cease. See *ante,* at 459. Even putting aside that the particular statement in that case was not entirely clear (the highest court to address the question described it as "equivocal," see *State* v. *Edwards,* 122 Ariz. 206, 211, 594 P. 2d 72, 77 (1979); see also 451 U. S., at 480, n. 6), *Edwards* no more decided the legal consequences of a less than "clear" statement than *Miranda,* by saying that explicit waivers are sufficient, 384 U. S., at 475, settled whether they are necessary. See *North Carolina* v. *Butler,* 441 U. S. 369, 373 (1979) (holding they are not). Were it otherwise, there would have been no reason after *Edwards* to identify the issue as unresolved, but see *Barrett, supra; Smith* v. *Illinois,* 469 U. S. 91, 95–96 (1984) *(per curiam).*

Nor, finally, is it plausible to read *Miranda* itself as a presage of the Court's rule, on account of language suggesting that questioning need not stop when a request for counsel is " 'indecisive.' " *Ante,* at 460 (quoting *Miranda,* 384 U. S., at 485). The statement quoted, however, is not taken from the Court's holding, but rather from a lengthy direct quotation of a letter to the Court from the Solicitor General, purporting to summarize then-current FBI practice (which the Court observed was "consistent," *id.,* at 484, with the rule announced). In any event, the letter further explains that, under the FBI policy, the "indecisive" suspect may be "question[ed] on whether he did or did not waive counsel," *id.,* at 485, an approach closer to the one advocated here than to the one the Court adopts.

*Miranda* safeguards exist "'to assure that *the individual's right to choose* between speech and silence remains unfettered throughout the interrogation process,'" see *Connecticut* v. *Barrett*, 479 U. S. 523, 528 (1987) (quoting *Miranda*, 384 U. S., at 469, and supplying emphasis), and that the justification for *Miranda* rules, intended to operate in the real world, "must be consistent with . . . practical realities," *Arizona* v. *Roberson*, 486 U. S. 675, 688 (1988) (KENNEDY, J., dissenting). A rule barring government agents from further interrogation until they determine whether a suspect's ambiguous statement was meant as a request for counsel fulfills both ambitions. It assures that a suspect's choice whether or not to deal with police through counsel will be "scrupulously honored," *Miranda, supra,* at 479; cf. *Michigan* v. *Mosley*, 423 U. S. 96, 110, n. 2 (1975) (White, J., concurring in result), and it faces both the real-world reasons why misunderstandings arise between suspect and interrogator and the real-world limitations on the capacity of police and trial courts to apply fine distinctions and intricate rules.

## B

Tested against the same two principles, the approach the Court adopts does not fare so well. First, as the majority expressly acknowledges, see *ante,* at 460, criminal suspects who may (in *Miranda's* words) be "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures," 384 U. S., at 457, would seem an odd group to single out for the Court's demand of heightened linguistic care. A substantial percentage of them lack anything like a confident command of the English language, see, *e. g., United States* v. *De la Jara*, 973 F. 2d 746, 750 (CA9 1992); many are "woefully ignorant," *Miranda, supra,* at 468; cf. *Davis* v. *North Carolina*, 384 U. S. 737, 742 (1966); and many more will be sufficiently intimidated by the interrogation process or overwhelmed by the uncertainty of their predicament that

the ability to speak assertively will abandon them.[4]   Indeed, the awareness of just these realities has, in the past, dissuaded the Court from placing any burden of clarity upon individuals in custody, but has led it instead to require that requests for counsel be "give[n] a broad, rather than a narrow, interpretation," see *Michigan* v. *Jackson*, 475 U. S. 625, 633 (1986); *Barrett, supra,* at 529, and that courts "indulge every reasonable presumption," *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938) (internal quotation marks omitted), that a suspect has not waived his right to counsel under *Miranda,* see, e. g., *Oregon* v. *Bradshaw,* 462 U. S. 1039, 1051 (1983) (Powell, J., concurring) ("We are unanimous in agreeing . . . that the *[Miranda]* right to counsel is a prime example of those rights requiring the special protection of the knowing and intelligent waiver standard") (internal quotation marks and brackets omitted); cf. *Minnick,* 498 U. S., at 160 (SCALIA, J., dissenting) ("[W]e have adhered to the principle that nothing less than the *Zerbst* standard" is appropriate for *Miranda* waivers).

Nor may the standard governing waivers as expressed in these statements be deflected away by drawing a distinction between initial waivers of *Miranda* rights and subsequent

---

[4] Social science confirms what common sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant.   See W. O'Barr, Linguistic Evidence: Language, Power, and Strategy in the Courtroom 61–71 (1982).   Suspects in police interrogation are strong candidates for these effects.   Even while resort by the police to the "third degree" has abated since *Miranda,* the basic forms of psychological pressure applied by police appear to have changed less.   Compare, e. g., *Miranda, supra,* at 449 (" '[T]he principal psychological factor contributing to a successful interrogation is *privacy'* ") (quoting F. Inbau & J. Reid, Criminal Interrogation and Confessions 1 (1962)), with F. Inbau, J. Reid, & J. Buckley, Criminal Interrogation and Confessions 24 (3d ed. 1986) ("The principal psychological factor contributing to a successful interrogation is privacy").

decisions to reinvoke them, on the theory that so long as the burden to demonstrate waiver rests on the government, it is only fair to make the suspect shoulder a burden of showing a clear subsequent assertion. *Miranda* itself discredited the legitimacy of any such distinction. The opinion described the object of the warning as being to assure "a continuous opportunity to exercise [the right of silence]," 384 U. S., at 444; see also *Moran* v. *Burbine*, 475 U. S. 412, 458 (1986) (STEVENS, J., dissenting); accord, *id.*, at 423, n. 1. "[C]ontinuous opportunity" suggests an unvarying one, governed by a common standard of effectiveness. The suggestion is confirmed by the very first statement that follows, that "there can be no questioning" if the suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney," *Miranda*, 384 U. S., at 444–445. "[A]t any stage" obviously includes the stage after initial waiver and the commencement of questioning, and "indicates in any manner" is a rule plainly in tension with the indication "with a vengeance," see *id.*, at 505 (Harlan, J., dissenting), that the Court would require for exercise of the "continuous" right at some point after initial waiver.

The Court defends as tolerable the certainty that some poorly expressed requests for counsel will be disregarded on the ground that *Miranda* warnings suffice to alleviate the inherent coercion of the custodial interrogation. *Ante*, at 460. But, "[a] once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice" to "assure that the . . . right to choose between silence and speech remains unfettered throughout the interrogation process," 384 U. S., at 469. Nor does the Court's defense reflect a sound reading of the case it relies on, *Moran* v. *Burbine, supra:*

> "Beyond [the] duty to inform, *Miranda* requires that the police respect the [suspect's] decision to exercise the rights outlined in the warnings. 'If the individual indicates in any manner, at any time prior to or during ques-

tioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease.'" 475 U. S., at 420 (quoting *Miranda, supra,* at 473–474).

While *Moran* held that a subject's knowing and voluntary waiver of the right to counsel is not undermined by the fact that police prevented an unsummoned lawyer from making contact with him, it contains no suggestion that *Miranda* affords as ready a tolerance for police conduct frustrating the suspect's subjectively held (if ambiguously expressed) desire for counsel. See 475 U. S., at 423 (contrasting *Escobedo* v. *Illinois*, 378 U. S. 478, 481 (1964), where "police incorrectly told the *suspect* that his lawyer 'didn't want to see him'"); see also *Miranda, supra,* at 468 (purpose of warnings is to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it").

Indeed, it is easy, amidst the discussion of layers of protection, to lose sight of a real risk in the majority's approach, going close to the core of what the Court has held that the Fifth Amendment provides. The experience of the timid or verbally inept suspect (whose existence the Court acknowledges) may not always closely follow that of the defendant in *Edwards* v. *Arizona* (whose purported waiver of his right to counsel, made after having invoked the right, was held ineffective, lest police be tempted to "badge[r]" others like him, see *Michigan* v. *Harvey,* 494 U. S. 344, 350 (1990)). Indeed, it may be more like that of the defendant in *Escobedo* v. *Illinois, supra,* whose sense of dilemma was heightened by his interrogators' denial of his requests to talk to a lawyer. When a suspect understands his (expressed) wishes to have been ignored (and by hypothesis, he has said something that an objective listener could "reasonably," although not necessarily, take to be a request), in contravention of the "rights" just read to him by his interrogator, he may well

see further objection as futile and confession (true or not) as the only way to end his interrogation.[5]

Nor is it enough to say that a "'statement either is . . . an assertion of the right to counsel or it is not.'" *Ante*, at 459 (quoting *Smith* v. *Illinois*, 469 U. S., at 97–98) (omitting brackets and internal quotation marks). In *Smith*, we neither denied the possibility that a reference to counsel could be ambiguous, see *id.*, at 98; accord, *id.*, at 101 (REHNQUIST, J., dissenting), nor suggested that particular statements should be considered in isolation, *id.*, at 98.[6] While it might be fair to say that every statement is meant either to express a desire to deal with police through counsel or not, this fact does not dictate the rule that interrogators who hear a statement consistent with either possibility may presume the latter and forge ahead; on the contrary, clarification is the intuitively sensible course.

The other justifications offered for the "requisite level of clarity" rule, *ante*, at 459, are that, whatever its costs, it will further society's strong interest in "effective law enforcement," *ante*, at 461, and maintain the "ease of application,"

---

[5] See *People* v. *Harper*, 94 Ill. App. 3d 298, 300, 418 N. E. 2d 894, 896 (1981) (defendant who asked interrogator to retrieve an attorney's business card from his wallet but was told that it "'wouldn't be necessary'" held not to have "availed himself" of right to counsel); see also *Cooper* v. *Dupnik*, 963 F. 2d 1220, 1225 (CA9 1992) (en banc) (describing elaborate police Task Force plan to ignore systematically a suspect's requests for counsel, on the theory that such would induce hopelessness and thereby elicit an admission, which would then be used to keep the suspect off the witness stand, see *Oregon* v. *Hass*, 420 U. S. 714 (1975) (statements obtained in violation of *Miranda* rules admissible for impeachment purposes)).

[6] Indeed, our *Smith* decision was quoting from the dissent below, which adverts in the same sentence to the possibility of *"bona fide* doubt the officer may still have as to whether the defendant desires counsel," in which case "strictly" limited questioning is prescribed. See *People* v. *Smith*, 102 Ill. 2d 365, 375, 466 N. E. 2d 236, 241 (1984) (opinion of Simon, J.).

*ibid.*, that has long been a concern of our *Miranda* jurisprudence. With respect to the first point, the margin of difference between the clarification approach advocated here and the one the Court adopts is defined by the class of cases in which a suspect, if asked, would make it plain that he meant to request counsel (at which point questioning would cease). While these lost confessions do extract a real price from society, it is one that *Miranda* itself determined should be borne. Cf. Brief for Americans for Effective Law Enforcement, Inc., et al. as *Amici Curiae* 5 (the clarification approach "preserves the interests of law enforcement and of the public welfare"); *Escobedo, supra,* at 490 ("No system worth preserving should have to *fear* that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, [his constitutional] rights").

As for practical application, while every approach, including the majority's, will involve some "difficult judgment calls,"[7] the rule argued for here would relieve the officer of

---

[7] In the abstract, nothing may seem more clear than a "clear statement" rule, but in police stations and trial courts the question, "how clear is clear?" is not so readily answered. When a suspect says, "uh, yeah, I'd like to do that" after being told he has a right to a lawyer, has he "clearly asserted" his right? Compare *Smith* v. *Illinois,* 469 U. S., at 97 (statement was "'neither indecisive nor ambiguous'") (citation omitted), with *id.,* at 101 (REHNQUIST, J., dissenting) (questioning clarity); see also *Oregon* v. *Bradshaw,* 462 U. S. 1039, 1041–1042 (1983) (plurality opinion) ("I do want an attorney before it goes very much further"); *Edwards,* 451 U. S., at 479 ("'I want an attorney before making a deal'"); cf. n. 3, *supra.* Indeed, in this case, when Davis finally said, "I think I want a lawyer before I say anything else," the agents ceased questioning; but see *People* v. *Kendricks,* 121 Ill. App. 3d 442, 446, 459 N. E. 2d 1137, 1139 (1984) (agents need not stop interrogation when suspect says, "'I think I might need a lawyer'"); cf. *People* v. *Santiago,* 133 App. Div. 429, 430–431, 519 N. Y. S. 2d 413, 414–415 (1987) ("'Will you supply [a lawyer] now so that I may ask him should I continue with this interview at this moment?'" held "not . . . an unequivocal invocation"). See generally *Smith, supra,* at 101 (REHNQUIST, J., dissenting) (noting that statements are rarely "crystal-clear"; "differences between certainty and hesitancy may well

any responsibility for guessing "whether the suspect in fact wants a lawyer even though he hasn't said so," *ante,* at 461. To the contrary, it would assure that the "judgment call" will be made by the party most competent to resolve the ambiguity, who our case law has always assumed should make it: the individual suspect. ·

## II

Although I am convinced that the Court has taken the wrong path, I am not persuaded by petitioner's contention that even ambiguous statements require an end to all police questioning. I recognize that the approach petitioner urges on us can claim some support from our case law, most notably in the "indicates in any manner" language of *Miranda,* and I do not deny that the rule I endorse could be abused by "clarifying" questions that shade subtly into illicitly badgering a suspect who wants counsel, but see *Thompson* v. *Wainwright,* 601 F. 2d 768, 771–772 (CA5 1979); cf. *State* v. *Walkowiak,* 183 Wis. 2d 478, 515 N. W. 2d 863 (1994) (Abrahamson, J., concurring) (suggesting means properly to focus clarification enquiry). But petitioner's proposal is not entirely in harmony with all the major themes of *Miranda* case law, its virtues and demerits being the reverse images of those that mark the Court's rule. While it is plainly wrong, for example, to continue interrogation when the suspect wants it to stop (and so indicates), the strong bias in favor of individual choice may also be disserved by stopping questioning when a suspect wants it to continue (but where his statement might be understood otherwise), see *Michigan* v.

---

turn on the inflection with which words are spoken, especially where [a] statement is isolated from the statements surrounding it").

As a practical matter, of course, the primary arbiters of "clarity" will be the interrogators themselves, who tend as well to be courts' preferred source in determining the precise words a suspect used. And when an inculpatory statement has been obtained as a result of an unrecorded, incommunicado interrogation, these officers rarely lose "swearing matches" against criminal defendants at suppression hearings.

*Mosley,* 423 U. S. 96, 109 (1975) (White, J., concurring in result) ("[W]e have . . . rejected [the] paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case"). The costs to society of losing confessions would, moreover, be especially hard to bear where the suspect, if asked for his choice, would have chosen to continue. One need not sign the majority's opinion here to agree that resort to the rule petitioner argues for should be had only if experience shows that less drastic means of safeguarding suspects' constitutional rights are not up to the job, see generally *United States* v. *Leon,* 468 U. S. 897, 927–928 (1984) (BLACKMUN, J., concurring) (exclusionary rule exception must be "tested in the real world of state and federal law enforcement, and this Court will attend to the results").

\* \* \*

Our cases are best respected by a rule that when a suspect under custodial interrogation makes an ambiguous statement that might reasonably be understood as expressing a wish that a lawyer be summoned (and questioning cease), interrogators' questions should be confined to verifying whether the individual meant to ask for a lawyer. While there is reason to expect that trial courts will apply today's ruling sensibly (without requiring criminal suspects to speak with the discrimination of an Oxford don) and that interrogators will continue to follow what the Court rightly calls "good police practice" (compelled up to now by a substantial body of state and Circuit law), I believe that the case law under *Miranda* does not allow them to do otherwise.