DECISION
Appellant, James M. Holman, was indicted by the Franklin County Grand Jury on 1 count of murder with a specification, in violation of R.C. 2903.02, and 1 count of having a weapon while under disability with a specification, in violation of R.C.2923.13. The charges related to the death of Jamecia ("MiMi") Ward, who died on September 20, 1997, from a single gunshot wound to the chest. The matter was tried by the court and appellant was found guilty of both charges. The trial court sentenced appellant as follows: sixteen years to life imprisonment as to Count 1 of murder and twelve months as to Count 2, with Count 2 being served consecutively to Count 1 and with an additional three years of actual incarceration for the use of a firearm, which was ordered to be served consecutively with and prior to the sentence imposed for count 1.
Appellant has appealed from his conviction and raises the following three assignments of error:
 1.THE TRIAL COURT COMMITS ERROR BY FAILING TO SUPPRESS APPELLANT'S STATEMENTS MADE TO THE POLICE ON SEPTEMBER 26, 1996.
 2. THE TRIAL COURT COMMITS ERROR BY FAILING TO SUPPRESS APPELLANT'S STATEMENT MADE TO THE POLICE.
 3. THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY. THIS DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.
On September 20, 1997, appellant and MiMi were involved in a dating relationship and had plans to attend a comedy show that evening. Appellant and an acquaintance, Paul Long, dropped MiMi off at a beauty salon on Cleveland Avenue. According to the testimony of Erica Hughes, a stylist at a beauty salon across the street, MiMi came across the street to use the pay phone several times on the afternoon of September 20, 1997. Hughes testified that MiMi appeared to be upset and that, when appellant arrived to pick her up, MiMi appeared to be arguing with him. Hughes also testified that MiMi did not show any signs of injury to her face when she saw her that day.
Paul Long testified that he was borrowing his uncle's automobile on September 20, 1997, to drive appellant around the city. They approached drug dealers, asked them to enter the car and then appellant robbed them of their money and property. Appellant also discharged a firearm that he had in his possession into the floor of the automobile near the robbery victims. Long also testified that appellant's pager went off several times and that they were late in picking up MiMi from the beauty salon. When they picked her up, MiMi was very upset with appellant for being late and the 2 argued in the car. According to Long's testimony, appellant turned around and hit MiMi and pulled out 1 of her hair extensions. For awhile MiMi was quiet, and then, when she spoke up again, appellant turned around and shot her. Long testified that when he asked appellant what he had d1, appellant told him to "shut up and keep driving." Almost immediately thereafter, a tire on the car blew out and Long exited the freeway. Long testified that appellant wanted Long to steal a tire for the car and to shoot appellant so that it would look like he and MiMi had both been shot by someone else. Long testified that appellant poured Coca-Cola on his hands and rubbed them together and that he did not immediately check on MiMi's condition. As soon as Long had an opportunity, he ran away from the scene.
Nadine Engler, a registered nurse at Mount Carmel West, testified that she was on duty when appellant walked into the hospital carrying MiMi. Appellant told her that a green van drove by and shot his girlfriend. Officer Joe DeVictor, of the Columbus Police Department, testified that appellant told him that two men from whom he stole cocaine, drove by his car and shot his girlfriend.
Steve Eppert, a Columbus Police Detective, testified that he interviewed appellant on September 20, 1997. At that time, appellant was treated as a witness to MiMi's murder and was not read his Miranda warnings. Eppert testified that appellant stated that MiMi was shot because appellant had been stealing cocaine from several drug dealers. Appellant told Eppert that several men exited a green van and approached his car and shot MiMi while she was seated in the vehicle.
On September 26, 1997, appellant was arrested for MiMi's murder and was interviewed at police headquarters by Detective Tim O'Donnell. Appellant was read his Miranda rights at this time and stated that he and MiMi had a verbal and physical altercation in the car after he picked her up at the beauty salon. According to the appellant, his gun accidentally discharged, MiMi was shot and he attempted to assist her.
Mark Harady, a laboratory scientist for the Columbus Police Crime Lab, testified that the firearm he examined at the request of Officer O'Donnell was in fair operating condition and that it could not discharge accidentally. He testified further that the characteristics of the bullet which killed MiMi were similar enough for him to determine that it was fired from the firearm which he examined.
Before the case came to trial, appellant filed motions to suppress the statements made by him both on September 20, 1997, as well as on September 26, 1997. Following a hearing, the trial court denied the motions to suppress both statements. The motions to suppress are the subject matter of appellant's first and second assignments of error.
Appellant contends that although the trial court redacted certain portions of his April 20, 1997 statement regarding probation, selling drugs, the drug activities of others, and appellant just sitting in the room, the remaining portions to which the defense had objected were irrelevant and prejudicial and should not have been considered by the trial court. Specifically, appellant contends that his statements to the police indicating that the people from whom he stole cocaine had shot MiMi should have been suppressed. The trial court had found that, at the time appellant made those statements, he was not in custody and found that the statement demonstrated appellant's consciousness of guilt.
With regard to the September 26, 1997 statement, appellant contends that he had invoked his right to counsel and that any further questioning by the police or statements made by him should have been excluded. After considering the matter, the trial court concluded that appellant had been fully informed of his Miranda rights, had acknowledged that he understood his rights and acknowledged that he understood his right to not talk with investigators without an attorney present. The court concluded that, even though appellant stated that he knew that he should talk to an attorney first, he did not indicate that he wanted counsel present before he would speak to the police. On appeal, appellant contends that he did affirmatively invoke his right to counsel.
In order for evidence to be relevant and therefore admissible, it must have a tendency to make the existence of any fact of consequence to the determination of the action more probable or less than it would be without the evidence. Evid.R. 401. Even if the evidence is relevant, it must be excluded under Evid.R. 403(A) if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. However, despite the mandatory terms of Evid.R. 403(A), the appropriate standard of review is an abuse of discretion standard. The Ohio Supreme Court has interpreted Evid.R. 403(A) to mean that the trial court has broad discretion in the admission of evidence and that unless the trial court has clearly abused its discretion and the defendant has been materially prejudiced thereby, a reviewing court should be slow to interfere. State v. Maurer (1984), 15 Ohio St.3d 239.
In reaching a decision involving the admissibility of evidence under Evid. R. 403(A) a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect. Maurer, supra,
paragraph seven of the syllabus. In order for the evidence to be deemed inadmissible, its probative value must be minimal and its prejudicial effect great. State v. Morales (1987), 32 Ohio St.3d 252. Furthermore, relevant evidence which is challenged as having probative value that is substantially outweighed by its prejudicial effect should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to the party opposing its admission. Maurer, supra, at 265.
In the present case, it must be remembered that this matter was tried before the court and there was no jury present. The trial court concluded that appellant's statements indicating that someone else had killed MiMi demonstrated his consciousness of his guilt. State v. McGuire (Nov. 13, 1997), Franklin App. No. 97APA02-180, unreported (1997 Opinions 4635). In McGuire, this court stated that exculpatory statements, when shown to be false or misleading, are circumstantial evidence of guilty consciousness and have independent probative value. This court concluded that prearrest statements made by the defendant in which he denied firing a weapon on the night of the incident were not offered at trial to prove the truth of the matter asserted and thus did not constitute hearsay; however, this court concluded that the trial court could arguably have concluded that defendant's false exculpatory statements had independent probative value as evidence of consciousness of guilt. In the present case, Long testified that after appellant shot MiMi, appellant wanted Long to shoot him to make it look like MiMi had been injured during a drive-by shooting. As such, because the trial court had a proper reason for not suppressing the statement and because other evidence of appellant's efforts to make it appear that someone else was responsible for MiMi's shooting, the trial court did not err in overruling appellant's motion to suppress the statements made during the September 20, 1997 interview. Appellant's first assignment of error is overruled.
With regard to the September 26, 1997 interview and statements, appellant asserts that the statements should have been suppressed because he had invoked his right to counsel during the interview. It is undisputed that, if a suspect in a criminal investigation requests counsel at any time during questioning, he is not subject to further interrogation until a lawyer is provided or the suspect reinitiates the interrogation. Arizona v. Roberson
(1988), 486 U.S. 675, and Edwards v. Arizona (1981),451 U.S. 477.
However, the invocation of the right to counsel requires, at a minimum, some statement that could reasonably be construed to be an expression of a desire for the assistance of an attorney. Davisv. United States (1994), 512 U.S. 452. If the statement by the suspect is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the police need not cease the questioning. Id. In Davis, the court acknowledged the following:
 We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who — because of fear, intimidation, lack of linguistic skills, or a variety of other reasons — will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." Moran v. Burbine, supra, 475 U.S., at 427, 106 S.Ct. at 1144. A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although Edwards provides an additional protection — if a suspect subsequently requests an attorney, questioning must cease-it is one that must be affirmatively invoked by the suspect.
The court in Davis then concluded that the statement "Maybe I should talk to a lawyer" was insufficient to require that questioning cease. In the present case, after the police officers read appellant his Miranda warnings and inquired as to whether or not he understood those warnings, appellant responded as follows: "I can — that I can talk or I can wait till I get my attorney to talk." (Tr. 400.) The officers then asked appellant if he wanted to make a statement. Appellant responded, "Yeah, I'd like to make a statement. You know, knowing the past stuff that I have ever been through with criminal or whatever, I know it's best to have an attorney, you know what I'm saying, but all I'm asking is put me in protective custody and get me an attorney appointed to me and then I'll make the statement. You know what I'm saying? I can't go down and, you know, country like that, because I might not live, you know what I'm saying, to even tell my side of the story. You know what I'm saying?" (Tr. 401.) At this point, the detective inquired as to whether appellant had received threats from anyone, and, after making reference to threats involving his family or neighbors, appellant responded as follows: "You know, but I just want to, you know what I'm saying, be able to stay alive till — you know what I'm saying? * * * To make my statement." (Tr. 402.)
At that point, the detective told appellant that he did not think that appellant had anything to worry about regarding the county jail and then the detective stated as follows: "[w]e want to give you this opportunity to tell us what happened that night. There was some problem with your story the first night that you gave us. However, if you request an attorney tonight, we're going to end the interview, okay? So you won't get an opportunity to tell us. That is your decision, what you want to do here. Okay? * * * If you want to talk to us now, we will listen. If you want an attorney, we're going to end the interview.".(Tr. 402-403.) Appellant responded as follows: "I mean, I mean, I just, you know, I just want to tell my statement so bad because, you know — * * * I want to do that. I just don't want — `cause I know I'm going to have a long trial and I don't want nothing to — you know what I'm saying — but what I have to say couldn't, you know what I'm saying, I just don't want — I wish you didn't talk — you know what I'm saying, but I — you know what I'm saying?' (Tr. 403.) The detective then asked appellant whether or not he wanted to make a statement and appellant replied in the affirmative. Appellant then talked about his activities that day and told the detective that the firearm accidentally discharged and MiMi was shot.
In Davis, the court addressed the issue of how a suspect must invoke the right to counsel and concluded that the Edwards
rule provides a bright line test that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. The court went on to state that if police were required to cease questioning if a suspect made a statement that might be a request for an attorney, the clarity and ease of application would be lost and police officers would be forced to make difficult judgment calls about whether or not the suspect in fact wanted a lawyer even though he has not said so, with the threat of suppression if they were to guess wrong. Furthermore, although the court acknowledged that it would be helpful if police officers would ask clarifying questions when a suspect made an ambiguous statement regarding counsel, the court refused to place such a requirement on them.
After carefully reviewing the tape and the transcript of the tape, this court concludes that the trial court did not err in determining that appellant had not clearly invoked his right to counsel during the September 26, 1997 interview. As the court stated in Davis, without a clear expression of his desire to speak with an attorney before he spoke to the police, appellant did not affirmatively invoke his right to counsel and the trial court did not err in overruling the motion to suppress. As such, appellant's second assignment of error is not well-taken and is overruled.
Turning to his third and final assignment of error, appellant asserts that his conviction was against the manifest weight of the evidence. The standard for determining whether a judgment in a criminal case is against the manifest weight of the evidence has been set forth by the Ohio Supreme Court in State v.DeHass (1967), 10 Ohio St.2d 230, paragraph two of the syllabus, which states:
 A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error occurred in the actual trial of the case or in the instructions given the jury by the court.
The test for whether the judgment is against the manifest weight of the evidence is broader than the test for whether there is sufficient evidence to support a conviction. In considering the manifest weight of the evidence, the reviewing court weighs the evidence in a limited sense to determine whether there is sufficient, competent, credible evidence to permit reasonable minds to find the defendant guilty beyond a reasonable doubt. An appellant court must ordinarily defer to the fact finder's resolution of factual and credibility issues. DeHass, supra.
The state was required to prove the elements of murder, with a firearm specification, beyond a reasonable doubt. "Murder" is defined in R.C. 2903.02(A) as: "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Purpose or intent can be established by circumstantial evidence. State v. Jenks (1991), 61 Ohio St.3d 259. Intent may be ascertained from the surrounding facts and circumstances in the case. State v. Lott (1990), 51 Ohio St.3d 160. The element of purpose in R.C. 2903.02 may be presumed where the natural and probable consequences of a wrongful act are to produce death. Intent to kill may be deduced from the surrounding circumstances, including the instrument used, its tendency to destroy life if designed for that purpose and the manner of inflicting the wound. State v. Burke (1995), 73 Ohio St.3d 399.
In the present case, Long testified concerning the verbal and physical altercation which took place between appellant and MiMi. Long stated that, after appellant hit MiMi she was quiet and then, when she spoke up again, appellant turned around and fired the gun at her. At that time, Long heard MiMi say that she was shot in the chest. Despite this information, Long testified that appellant did not direct him to drive to a hospital. Instead, after they excited the freeway, appellant rinsed his hands with Coca-Cola and asked Long to shoot him so that it would appear that he and MiMi had been shot by someone else. Long did not see appellant give any immediate aid to MiMi; however, at some point in time, appellant did take MiMi to the hospital.
The evidence demonstrates that appellant was familiar with firearms and that he had shot this particular firearm previously. He and MiMi were having a fight and Long testified that MiMi indicated that she was not going to put up with appellant any longer. According to Long, appellant turned around, faced the back seat, pointed the gun and fired. MiMi was shot on the right breast and the bullet exited from her back approximately eight inches to the left and two inches lower.
Based on the above, this court concludes that the trial court's finding that appellant purposely caused the death of MiMi is not against the manifest weight of the evidence. Appellant's third assignment of error is overruled.
Based on the foregoing, appellant's first, second and third assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
TYACK and PETREE, JJ., concur.