The STATE of Ohio, Appellee,

v.

SALINAS, Appellant.

[Cite as *State v. Salinas* (1997), 124 Ohio App.3d 379.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 96–L–146.

Decided Dec. 8, 1997.

380

*Charles E. Coulson,* Lake County Prosecuting Attorney, and *Taylir K. Linden,* Assistant Prosecuting Attorney, for appellee.

*Patrick S. Lavelle,* for appellant.

---

NADER, Judge.

Defendant-appellant, Emeterio Salinas, Jr., appeals his conviction and sentence on three counts of felonious assault with firearm specifications.

On the cold winter evening of Sunday, January 22, 1996, appellant was riding around the city of Painesville with four of his friends: Nicholas Coleman, Brian Semosky, Chris Davis, and Keith Summers.[1] Appellant was carrying a concealed nine-millimeter gun. Nicholas Coleman drove the five youths in a minivan belonging to his mother; appellant sat in the front passenger seat. At some point, the youths stopped at a convenience store in Painesville, where appellant and Brian Semosky persuaded another individual to purchase beer for them, which they consumed while riding around town.

Meanwhile, three families on Circle Drive in Perry Township were settling in their homes for the evening. At 2583 Circle Drive, Mr. and Mrs. Swann had just returned home from an afternoon outing. Mrs. Swann went into her living room, located at the front of the house and framed by a large picture window, to listen to the messages on her answering machine. The lights in the living room, along

---

1. All of the young men ranged in age from seventeen to eighteen.

with other lights around the house, were on and the living room curtains were open.

At 2586 Circle Drive, the Goecker family was scattered throughout their bi-level house doing various things: Mr. Goecker was upstairs sleeping, Mrs. Goecker was in the first-floor kitchen working on bills, their son was in the front living room watching television, and their daughter was downstairs working on the computer. The living room of the Goecker house contains a large picture window, which faces Circle Drive. The lights were on in the living room and around the house, and Mr. Goecker's van was parked in the driveway.

At 5254 Circle Drive,[2] most of the members of the Leonard family were watching television in their living room, which is located in the front of their home and framed by a large picture window. The lights in the living room, along with other lights in the house and the porch light, were lit.

At approximately 8:30 p.m., the minivan in which appellant was riding arrived at Circle Drive; Nicholas Coleman drove to Circle Drive at appellant's request. The minivan pulled onto Circle Drive and proceeded in a northeasterly direction past the Swann, Goecker, and Leonard homes. At some point, appellant instructed Nicholas to turn around, which he did. When the minivan approached the Swann residence, going approximately twenty-five miles per hour, appellant rolled down his window, placed his arm outside, and opened fire, emptying his nine-millimeter gun into these homes. All told, appellant fired fourteen shots.

Bullets fired from appellant's gun hit each of these three homes. In fact, a bullet pierced the living room picture window of each house, narrowly missing at least one occupant of each home. Bullets also pierced other parts of these homes, causing damage to interior walls and fixtures, to various automobiles parked in garages and driveways, and to garage doors. Luckily, none of the occupants was injured.

When Nicholas Coleman realized that appellant was firing at the houses and had emptied his gun, he accelerated out of the neighborhood. None of the minivan's occupants reported the incident to the police. The residents of Circle Drive immediately reported the drive-by shooting to the Lake County Sheriff's Department.

The day after the shooting, appellant told Brian Semosky that he hoped no one was "hit or hurt" in the shooting. Appellant told Brian that he was relieved when the newspaper reported that no one was injured.

---

2. Although the street numbers do not seem to reflect this, the three families live side by side on Circle Drive.

After receiving a tip from a confidential informant, the police contacted and interviewed Nicholas Coleman, who told them what happened. Appellant and Brian Semosky were then picked up and went voluntarily to the Sheriff's Department for questioning.

Appellant was placed in the office of Detective Jamie Meyers of the Lake County Sheriff's Department. Detective Meyers informed appellant that he was being questioned about a drive-by shooting in Perry Township; he also informed appellant of his *Miranda* rights. After informing appellant of his rights, Detective Meyers provided appellant a copy of a *Miranda* warning and waiver form used by the Sheriff's Department. The form explains the defendant's *Miranda* rights, which must be initialed by the defendant, and contains an area in which the defendant may compose a statement.

Detective Meyers asked appellant to read the form and initial it if he understood its contents. After appellant had done so, he "seemed a bit puzzled as to whether to go on," according to Detective Meyers. At that point appellant stated, "Maybe I want a lawyer, maybe I should talk to a lawyer."[3] Detective Meyers asked appellant if he or his family had an attorney; appellant stated that he did not. Detective Meyers then gave appellant a Lake County phone book. Because appellant seemed confused and unable to find attorney listings, Detective Meyers told him to look in the yellow pages under the heading "Attorneys." At this point, appellant closed the phone book and said, "I just want to get this over with; let's get started." Detective Meyers then re-*Mirandized* appellant and specifically asked appellant whether he wanted an attorney. Appellant's response was "I do not want an attorney." Thereafter, appellant made a confession to the drive-by shooting and reduced it to writing.

Appellant was indicted on three counts of felonious assault, each with a specification for possession of a firearm, and three counts of improperly discharging a firearm at or into a habitation, each with specifications for making an actual threat of physical harm with a deadly weapon and possession of a firearm.

Before trial, appellant filed a motion to suppress his confession on the ground that it was taken in violation of his Fifth Amendment and *Miranda* rights.[4] The court denied the motion, and a jury trial was conducted. At the close of the state's evidence, appellant moved for a Crim.R. 29(A) judgment of acquittal, arguing that the state failed to provide sufficient evidence to prove the requisite

---

3. Detective Meyers was initially unable to remember the exact words appellant used, but, in a memorandum to one of the prosecuting attorneys, he quoted appellant as using these words. The trial court found, and no one contests, that these were the words appellant used. Moreover, appellant did not testify at the suppression hearing.

4. Appellant also objected to the introduction of his confession at trial.

*mens rea* on the felonious assault charges—"knowingly." The court overruled the motion.[5]

The jury found appellant guilty on all counts and specifications. After obtaining a presentence report, the court sentenced appellant to an indefinite term of six to fifteen years in prison on each count of felonious assault, the sentences to run consecutively. Additionally, the court sentenced appellant to a term of three years' actual incarceration for each firearm specification on the felonious assault counts, to run consecutively to and prior to the sentences for the three counts of felonious assault. The other counts and specifications were merged into the felonious assault counts for sentencing purposes. Appellant's total sentence is twenty-seven to fifty-four years in prison. Appellant timely appealed his conviction and sentence, raising four assignments of error:

"1. The lower court erred when it denied defendant-appellant's motion to suppress evidence.

"2. The lower court erred when it sentenced defendant-appellant to three terms of actual incarcerations [*sic* ] consecutively based on the gun specifications contained in the indictment.

"3. The lower court erred when it denied defendant's motion for acquittal pursuant to Rule 29 of the Ohio Rules of [Criminal] Procedure.

"4. The jury determination in the lower court was against the manifest weight of evidence."

Appellant maintains, as his first assignment of error, that the trial court erred in overruling his motion to suppress. The motion was based upon appellant's allegation that his Fifth Amendment and *Miranda* rights were violated when Detective Meyers failed to cease questioning him after he invoked his right to counsel.

Once a criminal defendant invokes his right to counsel during a custodial police interrogation, the police must cease all questioning. *Miranda v. Arizona* (1966), 384 U.S. 436, 444–445, 86 S.Ct. 1602, 1612–1613, 16 L.Ed.2d 694, 706–707; *Edwards v. Arizona* (1981), 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1884–1885, 68 L.Ed.2d 378, 385–387. The questioning may not resume until the defendant has had the opportunity to consult with counsel who is present for any further interrogation or the defendant himself reinitiates discussions with police. *Id.* If a confession is taken in violation of this rule, the confession must be suppressed. *Id.*

---

5. Appellant renewed his motion at the close of all evidence.

However, the request for an attorney must be clear and unambiguous before this protection attaches. *Davis v. United States* (1994), 512 U.S. 452, 458–460, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 370–372. Whether a defendant has clearly requested an attorney is governed by an objective standard:

"Although a suspect need not 'speak with the discrimination of an Oxford don,' * * * he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [*Miranda* and] *Edwards* do[ ] not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371. See, also, *State v. Henness* (1997), 79 Ohio St.3d 53, 63, 679 N.E.2d 686, 695–696 (adopting the *Davis* test in Ohio).

Thus, if a defendant does not clearly and unambiguously request an attorney, the police are not required to terminate the interrogation. In fact, the Supreme Court of the United States has held that the officers conducting the interrogation are not required to ask "clarifying questions" to determine whether the accused actually wishes to have an attorney present. *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356, 129 L.Ed.2d at 373 ("[W]e decline to adopt a rule requiring officers to ask clarifying questions."). Even so, this court held, before the Supreme Court's decision in *Davis*, that the proper procedure for law enforcement officers to follow is to ask clarifying questions. *State v. Whitsell* (1990), 69 Ohio App.3d 512, 527–528, 591 N.E.2d 265, 275–276. Moreover, the Second Appellate District recently held that the "better practice was the alternative [actually] followed in *Davis*," wherein the interrogating officer asked clarifying questions to ascertain the meaning of the defendant's equivocal statement regarding an attorney. *State v. Hanson* (Sept. 13, 1996), Montgomery App. No. 15405, unreported, 1996 WL 535297. Nonetheless, these "clarifying questions" are not *required* when dealing with an ambiguous statement regarding an attorney because, under the *Davis* rationale, the right to counsel has not been invoked. *Davis, supra.*

In *Davis*, the Supreme Court concluded that the statement "Maybe I should talk to a lawyer" was not a clear and unambiguous request for an attorney. Thus, the interrogating officers were not required to terminate the questioning. *Id.*, 512 U.S. at 462–464, 114 S.Ct. at 2357, 129 L.Ed.2d at 373–374. Moreover, the Supreme Court of Ohio recently concluded that the statement "I think I need a lawyer because if I tell everything I know, how do I know I'm not going to wind up with a complicity charge?" was similarly ambiguous, relying heavily on *Davis*. *Henness*, 79 Ohio St.3d at 63, 679 N.E.2d at 696 (holding that "appellant's statement 'I think I need a lawyer * * *' is just as ambiguous as the statement made by the defendant in *Davis*").

■ Turning to the present case, appellant stated, "Maybe I want a lawyer, maybe I should talk to a lawyer." This statement parrots the words found in *Davis* to be too ambiguous to invoke the right to counsel. In accordance with the holdings of the Supreme Court of the United States and this state, we conclude that the trial court was correct in finding this statement equivocal and in overruling appellant's motion to suppress his confession on Fifth Amendment and *Miranda* grounds.

■ Although we find that Detective Meyers was under no obligation to terminate the interrogation or ask clarifying questions under current Supreme Court case law, we are troubled by the events that occurred after appellant's ambiguous request. The better practice would have been to merely ask, "Do you want an attorney?" rather than to give appellant a telephone book and imply he was "on his own" to find an attorney at 9 o'clock on a Friday evening.

Appellant's first assignment of error is overruled.

■ By his second assignment of error, appellant challenges the trial court's imposition of three terms of actual incarceration for the firearm specifications. Appellant contends that the trial court was required to merge these specifications because the felonious assault charges arose out of a single transaction. We agree.

R.C. 2929.71(B) provides:

"If an offender is convicted of * * * two or more felonies and two or more specifications charging him with having a firearm on or about his person or under his control while committing the felonies, each of the three-year terms of actual incarceration imposed pursuant to this section shall be served consecutively with, and prior to, the * * * indefinite terms of imprisonment imposed pursuant to section * * * 2907.11 of the Revised Code, *unless any of the felonies were committed as part of the same act or transaction. If any of the felonies were committed as part of the same act or transaction, only one three-year term of actual incarceration shall be imposed* for those offenses, which three-year term shall be served consecutively with, and prior to, the * * * indefinite terms of imprisonment * * *." (Emphasis added.)

■ The Supreme Court of Ohio supplied a definition for the word "transaction," which appears in R.C. 2929.71(B). A transaction is " 'a series of continuous acts bound together by time, space and purpose, and directed toward a single objective.' " *State v. Wills* (1994), 69 Ohio St.3d 690, 691, 635 N.E.2d 370, 371, quoting *State v. Caldwell* (Dec. 4, 1991), Summit App. No. 14720, unreported, at 26–27, 1991 WL 259529. See, also, *State v. Stilson* (Dec. 13, 1996), Hocking App. No. 95CA28, unreported, 1996 WL 735246 (stating that the offenses must be part of the same "criminal adventure" to merge the firearm specifications). In

employing this definition, the *Wills* court impliedly rejected the "separate animus" test utilized by many courts in this analysis. See *State v. Gregory* (1993), 90 Ohio App.3d 124, 129, 628 N.E.2d 86, 89–90. Appellate courts have focused primarily upon whether the defendant acted with a single purpose or objective when considering whether firearm specifications arise from a single transaction. See, *e.g.*, *State v. Emanuel* (Sept. 19, 1996), Franklin App. No. 96APA01–59, unreported, 1996 WL 531938 (collecting case law on this point). If there was singleness of purpose, the courts have held that merger of the firearm specifications is required. *Id.*

Here, appellant fired fourteen shots, in rapid order, without a pause or break of any length. Although the bullets traveled to three separate homes and appellant's actions resulted in three separate criminal acts, they were bound together by space and time, as they all occurred within a short distance and within a matter of thirty seconds. See, *e.g.*, *State v. Jones* (May 31, 1994), Franklin App. No. 93APA09–1261, unreported, 1994 WL 263810 (merging firearm specifications when "shootings occurred within seconds of each other"); *State v. Arnold* (Mar. 27, 1986), Cuyahoga App. No. 50405, unreported, 1986 WL 3722 ("The testimony revealed that three shots were fired by appellant at Craft and McKnight *within a matter of seconds*. Clearly, under these facts, the two counts of felonious assaults were committed 'as part of the same act or transaction'" [emphasis added]); *State v. Hughley* (1984), 20 Ohio App.3d 77, 20 OBR 97, 484 N.E.2d 758. In fact, the only reason three houses were hit by bullet spray was that the minivan in which appellant was riding was moving.

Regarding appellant's "objective" or "purpose" in spraying these homes with gun fire, Detective Meyers testified that appellant's objective was to scare another resident of Circle Drive, Rick Hersman. Appellant was unsure which house on the block belonged to Hersman so he just shot at a group of homes. In his appellate brief, appellant argues that his objective was to empty his gun; he did not intentionally aim at any one house. In either case, appellant acted with a single purpose in shooting in the direction of these homes. Accordingly, the three felonies of which appellant was convicted "were committed as part of the same * * * transaction," and the trial court erred in imposing three terms of actual incarceration under R.C. 2929.71(B). Appellant's second assignment of error is sustained.

Appellant's third and fourth assignments of error both attack the *mens rea* element of the prosecution's case. Appellant contends for this third assignment of error that the trial court erred in overruling his Crim.R. 29(A) motion for judgment of acquittal because the state failed to prove that he acted knowingly in shooting at these homes.

Crim.R. 29(A) requires the court, on the defendant's motion, to enter a judgment of acquittal if the evidence is not sufficient to sustain a conviction on the offense. The court may not grant a Crim.R. 29(A) motion if the evidence demonstrates that reasonable minds could reach a different conclusion as to whether each material element of the crime has been proven beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

" '[T]he test is whether after viewing the probative evidence and the inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.' " *State v. Davis* (1988), 49 Ohio App.3d 109, 113, 550 N.E.2d 966, 969, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720.

R.C. 2903.11 defines the offense of felonious assault:

"(A) No person shall *knowingly:*

"* * *

"(2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code." (Emphasis added.)

Thus, the crime of felonious assault requires a showing that the defendant acted "knowingly." R.C. 2901.22(B) provides the definition of the term "knowingly":

"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

This court was recently confronted with this issue in a factually similar case. In *State v. Butticci* (Nov. 22, 1996), Lake App. No. 95–L–121, unreported, 1996 WL 702473, the appellant, Carmen Butticci, was convicted of felonious assault and improperly discharging a firearm at or into a habitation, along with a firearm specification. On a Tuesday evening around the supper hour, Butticci and two friends were driving around the city of Mentor–on–the–Lake. Butticci was sitting in the front passenger seat and was carrying a firearm. Butticci told his friends that he wanted to shoot at a house, but did not state which particular house he wanted to target. His friend, Robinson, suggested that Butticci shoot at Suzanne Brewster's house, because Suzanne's daughter was a friend of

Robinson's ex-girlfriend. The group proceeded in the direction of the Brewster residence.

In the meantime, Suzanne Brewster was entertaining guests in her home on Marine Parkway. After dinner, Brewster and her guests were seated in her front living room watching television. The living room had a large picture window which faced the street. The living room light was on and the guests' cars were parked in Brewster's driveway.

Beginning at approximately 8:35 p.m., appellant and his friends drove past Brewster's house three times. On the third pass, Butticci opened fire on the house. Several bullets pierced the Brewster residence and the cars parked in her driveway. Also, a stray bullet hit the house behind Brewster's house.

Butticci asserted the same argument as appellant does here, that the state failed to produce any evidence indicating that he had "knowingly" tried to cause physical harm to the persons inside the residence. He argued that the evidence could only be interpreted to show he had acted "recklessly."

In affirming Butticci's conviction, this court engaged in the following discussion:

"[A] finding that the defendant acted 'knowingly' can be inferred from the fact that he shot a gun in a place where there is a risk of injury to a person. See *State v. Gregory* (1993), 90 Ohio App.3d 124 [628 N.E.2d 86]. Specifically, the courts have held that a motion for a judgment of acquittal as to the element of 'knowingly' was properly denied when the evidence indicated that the defendant randomly fired the gun in the direction of persons and residential houses. *State v. Phillips* (1991), 75 Ohio App.3d 785 [600 N.E.2d 825]; *State v. Dunaway* (June 24, 1993), Cuyahoga App. No. 62683, unreported [1993 WL 227135].

"In this case, even though the evidence indicated that there were no persons visible to appellant when he fired the gun, the evidence was still sufficient to establish that he 'knew' that he was shooting toward a residential structure which appeared to be occupied. * * * [A]ppellant had the opportunity to see that there were two cars parked in the driveway and that there was a light on in one of the main rooms of the home. Given these facts, a trier of fact could readily find that, before he fired the gun, appellant was aware that it was probable that people were inside the home.

"[W]e would emphasize that the evidence was sufficient to demonstrate that, although appellant may not have been shooting at any specific area of the house, he was shooting directly toward the house; *i.e.*, the evidence did not support the finding that he was shooting the gun into the air and the bullets just happened to hit the house. * * *

"[A]ppellant [also] * * * contends that, at the moment he fired the gun, it was not 'probable' that he would hit someone; *i.e.*, the chances were not greater than fifty percent that someone would be hit.

"The fallacy in that assumption is that appellant only 'knew' that it was highly likely that there were people in the house; he did not know how many or where they were. Thus we agree with *Phillips* and *Dunaway* that such a random shooting supports the inference of 'knowingly.'" *Id.* at 14–16.

 The similarities between *Butticci* and this case are striking. As in *Butticci*, the shooting took place on a January evening at approximately 8:30 to 8:40 p.m., appellant took shots at lighted residential structures, cars were parked in the driveways of these homes, and the occupants were watching television in a living room which faced the street. Moreover, appellant's awareness of the high probability that people were in these homes is evidenced by his statement to Brian Semosky, the day following the shooting, that he hoped no one was "hit or hurt" in the shooting. Here, as in *Butticci*, we conclude that the evidence was sufficient to send the question of appellant's guilt to the jury.

Appellant's third assignment of error lacks merit.

 By his fourth assignment of error, appellant claims that the jury's verdict was against the manifest weight of the evidence. A "manifest weight" challenge attacks not the prosecution's presentation of substantial evidence on each element of the crime as in a "sufficiency" challenge, but the credibility and weight of the evidence presented. *State v. Schlee* (Dec. 23, 1994), Lake App. No. 93–L–082, unreported, at 11, 1994 WL 738452.

"In determining whether the verdict [is] against the manifest weight of the evidence, ' * * * [t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Davis*, 49 Ohio App.3d at 113, 550 N.E.2d at 969, quoting *Martin*, 20 Ohio App.3d at 175, 20 OBR at 218–219, 485 N.E.2d at 720–721.

 In other words, when reviewing a manifest weight challenge, the appellate court sits as a "thirteenth juror."

 We also find that the jury's verdict, finding appellant guilty of felonious assault, was supported by the manifest weight of the evidence. His argument is also based on the *mens rea* element of the crime. The evidence clearly supports the jury's conclusion that appellant acted knowingly in firing fourteen shots in the direction of residential homes. See *Gregory*, 90 Ohio App.3d at 131, 628 N.E.2d

at 91 (holding that "[t]he shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that appellant acted 'knowingly'" and upholding appellant's conviction as being supported by the manifest weight of the evidence).

Appellant's fourth assignment of error is without merit.

In accordance with the foregoing, the judgment of the trial court is affirmed in part and reversed in part, and this cause is remanded to the trial court for resentencing consistent with this opinion.

*Judgment accordingly.*

FORD, P.J., and CHRISTLEY, J., concur.