OPINION
Defendant-appellant, Ivan Revels, appeals his aggravated robbery conviction in the Butler County Court of Common Pleas. We affirm the conviction.
On September 22, 2000, a few minutes before 10:00 p.m., the LaRosa's restaurant on Fountains Boulevard in West Chester, Ohio was robbed at gunpoint. The offender was described by the restaurant's manager as a black male, wearing black clothing, black ski mask, and white shoes. He approached the counter, handed the assistant manager a book-bag type satchel, and ordered him to put as much money as he could into the bag within 30 seconds. The assistant manager complied, and the offender fled out the front door, taking approximately $550 with him. The robbery was captured on the store's video surveillance camera.
The West Chester Police Department was immediately notified. Within 20 minutes of the offense, West Chester Police Officer Richard Michaud was dispatched to scout the area around the robbery location. He observed appellant, who largely matched the description of the offender, absent the ski mask, approach an apartment building at the Woodbridge by the Lake apartment complex. Officer Michaud apprehended appellant and took him to the LaRosa's restaurant, where witnesses to the robbery were asked if they could identify him as the robber. However, since the offender had worn a face mask, no one was able to identify appellant as the robber, and he was allowed to leave.
The investigation into the robbery continued and included an interview with Mark Ramos, a friend who appellant was with the night of the robbery. Based on information provided by Ramos, West Chester Police Officer Jeff Rooney and two other officers went to appellant's home and asked him to come to the police station to answer questions regarding the LaRosa's robbery. Officer Rooney advised appellant that the questioning was purely voluntary. In response, appellant stated that he had "no problem" complying with the request and went with the officers to the West Chester police station in a marked police cruiser.
Once there, Detective Mike Quinn interviewed appellant. Before the interview began, appellant first asked Detective Quinn whether he should have an attorney present. Detective Quinn informed appellant that it was appellant's choice whether to have an attorney present. Detective Quinn then read appellant his Miranda rights. Appellant stated that he understood his Miranda rights, wished to waive them, and he subsequently executed a written waiver of his rights.
Appellant initially denied that he was involved in the robbery. Midway through the questioning, Detective Quinn left the interview room for a few moments. Upon his return, he suggested to appellant that the police had additional evidence which pointed to appellant as the primary suspect in the investigation. Shortly thereafter, appellant confessed to committing the robbery.
He told Detective Quinn that his mother was experiencing financial hardship and that he needed the money to pay bills. He stated that he had spent the earlier part of the evening drinking beer with Ramos and others. When they separated, he decided to rob the LaRosa's restaurant in order to make some "quick cash." He stated that he put on a ski mask, entered the restaurant, and committed the robbery brandishing an unloaded, 9 mm gun. He then left, hiding the money along the way, before going to a friend's home at the Woodbridge by the Lake apartment complex. He later gave the gun to an individual named Delmar.
After making this oral statement, appellant also made a written statement. Appellant signed the written statement, which included a recitation of his Miranda rights and a statement that he chose to waive those rights. In the written statement, appellant indicated where he had hidden the money, although neither it, nor the handgun brandished in the robbery, were ever recovered.
Appellant was subsequently indicted for aggravated robbery with a firearm specification. He filed a motion to suppress his written and oral statements to the police. The trial court denied the motion and the case was tried to a jury. Appellant was found guilty and sentenced accordingly. He appeals his conviction, raising four assignments of error.
Assignment of Error No. 1:
 "THE TRIAL COURT ERRED BY DENYING A MOTION TO SUPPRESS WHERE INTERROGATION CONTINUED AFTER DEFENDANT-APPELLANT REQUESTED AN ATTORNEY RENDERING ANY SUBSEQUENT STATEMENTS PER S.E. INVOLUNTARY AND COERCIVE."
When considering a motion to suppress evidence, the trial court serves as the trier of fact and is the primary judge of the weight of the evidence and the credibility of witnesses. State v. Fanning (1982),1 Ohio St.3d 19, 20. When reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's findings if they are supported by competent, credible evidence, State v. McNamara
(1997), 124 Ohio App.3d 706, 710, and relies upon the trial court's ability to assess the credibility of witnesses. State v. Anderson
(1995), 100 Ohio App.3d 688, 691. An appellate court, however, reviews de novo whether the trial court applied the appropriate legal standard to the facts. Id.
Appellant asserts that Detective Quinn continued to question him even after he requested legal counsel at the onset of the interview. He thus concludes that his subsequent written and oral confessions were obtained in violation of his Miranda rights and that the trial court erred as a matter of law by overruling his motion to suppress the confessions.
If an accused in custody has clearly asserted his right to counsel during a police interview, questioning must cease until counsel has been made available to him or the accused initiates further conversation.Davis v. U.S. (1994), 512 U.S. 452, 458, 114 S.Ct. 2350; Edwards v.Arizona (1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880. This "rigid prophylactic rule" embodies two distinct inquiries. Smith v. Illinois
(1984), 469 U.S. 91, 94-95, 105 S.Ct. 490. First, courts must determine whether the accused actually invoked his right to counsel. Id. citingEdwards, 451 U.S. at 484-485; Miranda v. Arizona (1966), 384 U.S. 436,444-445, 86 S.Ct. 1602. Second, if an accused has invoked his right to counsel, the courts may admit his responses to further questioning only if (1) he initiated further discussions with the police, and (2) he knowingly and intelligently waived the right he had invoked. Smith
citing Edwards, at 485-486.
This case requires an examination of the threshold inquiry: whether appellant invoked his right to counsel in the first instance. As a general rule, police officers must honor an invocation of the right to end questioning upon a request for legal counsel only if the request is unambiguous. Davis, 512 U.S. at 452. If a suspect makes a reference to an attorney "that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking his right to counsel," the interviewing officer is not required to cease questioning. Id. at 459.
In Davis, the Court concluded that the statement, "maybe I should talk to a lawyer" was not a clear and unambiguous request for an attorney. Thus, the interrogating officers were not required to terminate the questioning. Id. Since Davis, the following statements are among those which have been considered too ambiguous or equivocal to require police to terminate questioning: "I think I need a lawyer," State v. Henness,79 Ohio St.3d 53, 63, 1997-Ohio-405; "Maybe I want a lawyer, maybe I should talk to a lawyer," State v. Salinas (Dec. 8, 1997),124 Ohio App.3d 379; "Well I'm going to need one," State v. Tefft, Allen App. No. 1-99-35, 1999-Ohio-866; "I think that I would like an attorney,"State v. Taylor (Feb. 9, 1999), Medina App. No. 2783-M; "I think I might need to talk to a lawyer," State v. Hanson (Sept. 13, 1996), Montgomery App. No. 15405; "I plead the Fifth," State v. Peterson (Oct. 14, 1996), Madison App. No. CA96-02-010; "I feel like, talk to my, have my lawyer present," and "[w]ell I mean, I'd like to have my lawyer here," State v.Stover (Apr. 16, 1997), Lorain App. No. 69CA006461; "[D]o I have to hire an attorney to have him present," and "maybe I need to have an attorney present," State v. Campbell (Nov. 6, 1997), Franklin App. No. 97APA04-462; "I'd rather have my attorney here if you're going to talk stuff like that," State v. Mills (Nov. 24, 1997), Clermont App. No. CA96-11-098; and "[m]aybe I should get a lawyer," and "[d]o you think I should get a lawyer?" State v. Metz (Apr. 21, 1998), Washington App. No. 96 CA 48.
In the present case, before Detective Quinn began the interview, appellant queried, "do I need to have an attorney before I'm speaking with you guys?" Detective Quinn responded, "it's up to you. * * * If you feel you want an attorney that's your choice." Appellant responded that he understood, but made no other statement indicating his desire to have an attorney present before continuing with the interview. Detective Quinn then proceeded to inform appellant of his Miranda rights. Appellant acknowledged that he understood his rights and subsequently executed a written waiver of his Miranda rights, including the right to have counsel present.
We see no distinction between the ambiguous and equivocal statements in the cases discussed above, and appellant's query whether he should have a lawyer. In view of the circumstances under which appellant made this statement, it was not an unambiguous request for counsel. As appellant's request for counsel was ambiguous and equivocal, it was insufficient to invoke his Miranda right to counsel and Detective Quinn was not required to cease questioning him. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 "THE TRIAL COURT ERRED BY DENYING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS INCULPATORY STATEMENTS GIVEN WHEN DEFENDANT-APPELLANT WAS IN CUSTODY FACING INTERROGATION AND WHERE POLICE OFFICERS NEVER RE-MIRANDIZED THE NOW PRIMARY SUSPECT."
In his second assignment of error, appellant contends that he should have been re-informed of his Miranda rights once Detective Quinn continued questioning him after leaving the room momentarily. He contends that the interrogation became custodial upon Detective Quinn's return to the room due to Detective Quinn's "changed attitude," and that the statements he made after this point should be suppressed because Detective Quinn failed to re-inform appellant of his Miranda rights.
It is well-established that an accused who is subjected to a custodial interrogation must be advised of his or her Miranda rights. State v.Treesh, 90 Ohio St.3d 460, 470, 2001-Ohio-4. The accused must make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible. Id. However, it is also well established that a suspect who receives adequate Miranda warnings prior to a custodial interrogation need not be warned again before each subsequent interrogation. Id. citing Wyrick v. Fields (1982), 459 U.S. 42,48-49, 103 S.Ct. 394; State v. Barnes (1986), 25 Ohio St.3d 203, 208; see, also, State v. Brewer (1990), 48 Ohio St.3d 50, 58-59. Police are not required to re-administer the Miranda warnings when a relatively short period of time has elapsed since the initial warnings. Treesh
citing State v. Mack, 73 Ohio St.3d 502, 513-514, 1995-Ohio-273.
Courts look to the totality of the circumstances when deciding whether initial warnings remain effective for subsequent interrogations. Statev. Roberts (1987), 32 Ohio St.3d 225, 232. In Roberts, the Ohio Supreme Court determined that the following factors are indicative of whether an initial warning remains effective for subsequent interrogations:
 "(1) the length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation [was] conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect."
Roberts at 232, quoting State v. McZorn (1975), 288 N.C. 417, 434,219 S.E.2d 201, 212.
Applying the Roberts criteria to the instant case, we note that the entire interview lasted no more than two hours, a relatively short time. At the beginning of the interview, appellant was informed of his Miranda
rights by Detective Quinn. Appellant indicated his awareness of those rights and voluntarily waived them. Only a short time passed between the initiation of the interview which included an advisement of appellant'sMiranda rights and appellant's confession. While Detective Quinn left the room for a few moments during the course of the interview, he returned to continue the interview and was not absent so long as to render the initial advisement stale. Accord Treesh, 90 Ohio St.3d 460,2001-Ohio-4 (break in police questioning does not necessarily compel the re-administering of Miranda warnings and obtaining an additional waiver); State v. Mack, 73 Ohio St.3d 502, 1995-Ohio-273 (police are not required to re-administer Miranda warnings when questioning a suspect again after a relatively short period of time). We therefore find, based on the totality of the circumstances, that no new Miranda advisement was required upon Detective Quinn's return to the interview room. Accordingly, the second assignment of error is overruled.
Assignment of Error No. 3:
 "DEFENDANT-APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO CALL ESSENTIAL WITNESSES, CROSS-EXAMINE STATE'S WITNESSES ON ESSENTIAL MATTERS NOR DID HE PRESENT A THOROUGH DEFENSE TO THE DEFENDANT-APPELLANT'S FALSE IDENTIFICATION THEORY."
To prevail on an ineffective assistance of counsel claim, a criminal defendant must demonstrate that his counsel's performance was deficient and that he was prejudiced thereby. Strickland v. Washington (1984),466 U.S. 686, 687, 102 S.Ct. 2052. A failure to make either showing will preclude the claim. Id. To demonstrate that counsel's performance was deficient, a defendant must show that his "counsel's representation fell below an objective standard of reasonableness." Id. at 688. To show that he was prejudiced by that deficient performance, a defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. There exists a strong presumption that licensed attorneys are competent, and that the challenged action is the product of sound trial strategy, falling within the wide range of professional assistance. State v. Bradley (1989), 42 Ohio St.3d 136, 142.
Judicial scrutiny of counsel's performance must be highly deferential. The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Strickland, 466 U.S. at 689. A defendant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. State v. Brown
(1988), 38 Ohio St.3d 305, 319.
Appellant first contends that his trial counsel was ineffective for failing to present a "false identification" theory of defense. Appellant points to the decision of his trial counsel not to cross-examine John Teglovic, a restaurant employee who witnessed the robbery. Teglovic testified that that the man who robbed the restaurant was approximately 5'5" tall. On the contrary, appellant was described by Officer Michaud as being 5'8" to 5'9" tall.
An appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination. Statev. Smallwood (Oct. 14, 1996), Butler App. No. CA95-12-209; State v. Davis (Dec. 4, 1995), Butler App. No. CA94-12-214. Such decisions are presumed to be the product of a sound trial strategy. Id.; see, also, State v.Clayton (1980), 62 Ohio St.2d 45, 48-49. In the present case, the decision not to cross-examine Teglovic is reasonable and sound considering the otherwise inculpatory nature of his testimony. In such a circumstance the decision not to cross-examine the witness is a matter of trial strategy which this court will not second-guess.
Appellant also contends that his trial counsel was ineffective for failing to call witnesses who could establish appellant's alibi. Appellant contends that he was with Andrea Thomas and Gerard Wright at the approximate time that the robbery occurred, and that if called to testify, these individuals would have confirmed his alibi.
Decisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics. State v. Coulter (1992),75 Ohio App.3d 219, 230. The mere failure to subpoena witnesses for a trial is not a substantial violation of defense counsel's essential duty absent a showing of prejudice. Id. citing State v. Hunt (1984),20 Ohio App.3d 310, 312; State v. Reese (1982), 8 Ohio App.3d 202, 203. As well, the failure to subpoena witnesses is not prejudicial if the testimony of those witnesses simply would have been corroborative. SeeMiddletown v. Allen (1989), 63 Ohio App.3d 443, citing State v. Warden
(1986), 33 Ohio App.3d 87.
At trial, appellant testified that Ramos dropped him off between 6:00 and 6:30 on the evening in question. Although his testimony is unclear, he apparently met up with Wright and Thomas at some point that evening. He further testified that the two were in a car with him when Officer Michaud encountered him 20 minutes after the robbery. However, it can not be ascertained from the record whether Wright and Thomas would have confirmed appellant's alleged alibi. Even appellant's own testimony is unclear as to whether Wright and Thomas could in fact provide appellant with an alibi. It would have been devastating to appellant's defense had his counsel called alibi witnesses who could not soundly verify appellant's version of the events, thus enabling the state to discredit appellant's alleged alibi. Upon the record before us, we find that counsel's decision not to call the alleged alibi witnesses constitutes sound trial strategy and does not constitute ineffective assistance. Accordingly, we overrule the third assignment of error.
Assignment of Error No. 4:
 "THE TRIAL COURT ERRED IN ADMITTING HEARSAY STATEMENTS WHICH IMPLICATED DEFENDANT-APPELLANT AS THE ASSAILANT."
In his final assignment of error, appellant alleges that the trial court erred by allowing Detective Quinn to testify regarding statements made to him by Mark Ramos.
The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Bey, 85 Ohio St.3d 489-490. Absent an abuse of discretion and a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of relevant evidence. State v.Martin (1985), 19 Ohio St.3d 122, 129. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Statev. Rivera (1994), 99 Ohio App.3d 325, 328.
When cross-examining Detective Quinn, the line of questioning pursued by appellant's counsel suggested that Detective Quinn had deceptively led appellant to believe that the police had evidence linking him to the crime when, in fact, the police did not. The questioning transpired as follows:
 "Q. Well, as well — as well as telling him — as well as working on this motive aspect you were also telling him you had evidence against him; is that right?
"A. That's correct.
 "Q. In fact, there was no evidence against him; is that right? Physical evidence of any kind?
 "A. That's not correct. We've — we had a — glove that we thought could have been his, that was recovered near the scene. That could have contained DNA evidence.
* * *
"Q. Do you intend to use the glove as evidence today?
"A. No, we do not.
* * *
"Q. Never found the gun or the money; is that right?
"A. That's correct.
 "Q. At that point you led him to believe that you had some information about those things, though; is that correct?
 "A. No, we did have information in regard to that. That was a stated fact on my part, "Information we'd received."
* * *
 "Q. Said at some point — those items were hid in the bushes and you [sic] information to that effect?
 "A. That's correct. We received information that he had hidden the money in-between the robbery and the point of contact Officer Michaud had with him, near Woodbridge by the Lake.
 "Q. The purpose of telling him you had these things was to get him to think that he was basically cornered and had no choice but to cooperate with you; is that right?
 "A. The purpose of telling him was, I was statin [sic] the facts of — as we knew it. How our investigating took us to this point.
 "Q. If you had enough evidence to proceed without this — without his confession you would have just went ahead and arrested him; is that right?
"A. That's correct."
On redirect examination, Detective Quinn was questioned regarding the source of the information he had previously testified about:
 "Q. Now, you indicated to him, during what we'll call part two of that interview, that you had information that he was involved?
"A. Yes, I did.
* * *
"Q. What was the source of that information?
 "A. The source was a gentleman by the name of Mark Ramos, and the follow-up investigation with Officer Rooney with several interviews. That was the source of our information.
 "Q. Okay. And that source of information provided you what?
At this point, appellant's counsel lodged an objection to the testimony that Detective Quinn might give relating statements made to the police by Ramos. The trial court overruled the objection, ruling that appellant had opened the door to the information by the line of questioning pursued on cross-examination. Detective Quinn was then permitted to give the following testimony:
 "A. The source of information provided us where — that the money was hidden, as well as a gun, and that [appellant] was involved in this. That source of information advised that he saw the gun, as well as the money, and that he transported Mr. Revels back to Meadowridge to get his car.
 "Q. All right. So you did have information that Ivan Revels was the one involved in the robbery?
"A. Yes."
Upon review of the record, we find the trial court did not abuse its discretion by allowing Detective Quinn to testify to the foregoing, on the basis that defense counsel opened the door to the testimony. We agree with the trial court that the line of questioning pursued by appellant's counsel opened the door for Detective Quinn's explanation as to the basis for his assertion that the police possessed evidence linking appellant to the crime. See State v. Ostrowski (1972), 30 Ohio St.2d 34,44; accord, State v. Fears, 86 Ohio St.3d 329, 1999-Ohio-111.
As well, we find that, contrary to appellant's assertions, Detective Quinn's testimony on this issue does not constitute hearsay. The testimony was not admitted for the truth of the matter asserted, but rather, to explain that Detective Quinn was not misleading appellant by indicating that the police had received evidence linking him to the crime. See State v. Williams (1996), 115 Ohio App.3d 24. Accordingly, appellant's fourth assignment of error is overruled.
Judgment affirmed.
POWELL and VALEN, JJ., concur.