McKEAGUE, Circuit Judge,
dissenting.
I disagree with the majority’s conclusion that “the evidence in this case establishes nothing more than that Nash brought out the gun to scare his wife, that he followed his wife into their daughter’s room on the same floor, and that the gun went off while Nash struggled with his son.” Maj. Op. at 766. Accordingly, I respectfully dissent.
Under the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), Nash can only be granted habeas relief if the Ohio Court of Appeals made an unreasonable application of the Supreme Court’s rule that a conviction is not supported by sufficient evidence if a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see also 28 U.S.C. § 2254(d)(1); Getsy v. Mitchell, 495 F.3d 295, 315-16 (6th Cir.2007) (en banc). Here, the Ohio Court of Appeals made no such unreasonable application.
Contrary to the majority’s contention, Ohio law is not “clear that bringing a gun to an argument and having it go off at a downward trajectory during a struggle, without the gun ever having been pointed at anyone, is not a felonious assault.” Maj. Op. at 766. First, the majority’s reliance on State v. Brooks, 44 Ohio St.3d 185, 542 N.E.2d 636 (1989), is misplaced. While Brooks involved a felonious assault arising from a heated argument, the gun was never fired, let alone fired twice. Indeed, the Ohio Supreme Court stated “[t]he act of pointing of a deadly weapon at another, without additional evidence regarding the actor’s intention, is insufficient evidence [for felonious assault].” Id. at 639. However, the court also explained that “experience has demonstrated that many homicides and serious assaults occur in the heat of impassioned arguments.” Id. at 643. The court emphasized that the victim and the defendant were “embroiled in a volatile argument” when the defendant drew a revolver, angrily told her that he would kill her, and only left the area when another person appeared to be calling the police. Id. The court held that it could not “say that a reasonable jury ... could not have concluded that the defendant’s actions were ‘strongly corroborative’ of his intent to cause physical harm.”[1] Id. (emphasis added).
*769 In Brooks, the defendant never fired the gun, whereas here, Nash fired it twice.[2] To my mind, firing a gun twice goes well beyond the mere act of pointing a gun. In other words, when a shot is fired (particularly here where two were fired), whether the gun was pointed at anyone arguably is part of the totality of the circumstances, but pointing the gun at the victim is not required to establish felonious assault.
To the extent Brooks is instructive, it explains that “additional evidence” of intent includes, in particular, a heated argument between the defendant and the victim. Indeed, here, like Brooks, we have just such additional evidence in the record. By all accounts, the argument between Nash and his wife was heated. It is undisputed that while the argument was still in progress, Nash retrieved a loaded gun, and without the safety engaged, introduced the gun into the argument. Indeed, by Nash’s own admission, he retrieved the gun to “scare” his wife.
Of course, the jury was entitled to disbelieve his account and infer from the circumstances that his intentions were even more nefarious. J.A. 386-87 (nephew admits that Nash was “breathing hard and [had a] mad face” when he came down the stairs after retrieving the gun); J.A. 597-98 (nephew in police report says Nash’s son was saying to his dad “what are you doing” and “put the gun down” and then “wrapp[ed] his arms around his father trying to stop him from shooting anybody”). In any event, a defendant acts knowingly, when, although not intending the result, he is nevertheless aware that the result will probably occur and therefore even assuming that Nash was only intending to “scare” his wife, he can still be found to have acted knowingly. See State v. Edwards, 83 Ohio App.3d 357, 361, 614 N.E.2d 1123 (1992).
Moreover, after Nash fired the gun during the initial struggle with his son, he did not leave the room, exit the home, or even simply put the gun down. Rather, he followed his wife into their daughter’s room and he fired the gun again during a second struggle with his son. J.A. 595-96, 598, 602. When he fired the gun the second time, he was well aware that it was loaded and fully operational. Indeed, this fact alone should put to rest any reasonable argument that there was not sufficient evidence of felonious assault here.[3]
The majority’s reliance on Pack is similarly unpersuasive. State v. Pack, 110 Ohio App.3d 632, 674 N.E.2d 1263 (1996). In Pack,
*770 [t]he evidence at trial established that, on March 11, 1994, the victim, Charles Allen, went to the home of appellant with another man, Leyman Pearson, for the purpose of buying a handgun which appellant had for sale. The evidence further established that after Pearson and appellant discussed the price of the handgun, appellant shot the gun into the floor and then into the ceiling. There was conflicting testimony as to whether appellant dry-fired the gun at Pearson. However, it was clearly established that appellant then pointed the gun at Allen while the two men were six inches to twelve inches apart. Allen testified that the gun was pointed at his chest. Allen further testified that he then pushed the gun away because he did not want to get shot. At that point, the gun went off and Allen was shot in the finger.
674 N.E.2d at 1263. The victim in Pack testified, “It wasn’t out of anger, or anything like that, he wasn’t saying, you know, pointing it at me to do me any bodily harm, he just was pointing it that way. Do you know what I’m saying?” Id. at 1264. In Pack, the evidence established that the defendant had zero intent to harm the victim, whereas here, even according to Nash’s version of events, he intended to “scare” his wife during a heated argument, in which he pursued his wife from one room to another with a loaded gun in his hand and the gun discharged twice. Nash’s reliance on State v. Mills, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992), is unpersuasive for the same reason as Pack, namely, no evidence suggested that the defendant intended to harm the victim.
The majority asserts that “[i]n previous cases upholding felonious assault convictions involving a discharged gun, the courts have explicitly relied on the fact that the gun was intentionally fired in the direction of another individual.” Maj. Op. at 767 (citing State v. Salinas, 124 Ohio App.3d 379, 706 N.E.2d 381, 389-90 (1997); State v. Owens, 112 Ohio App.3d 334, 678 N.E.2d 956, 958 (1996); State v. Gregory, 90 Ohio App.3d 124, 628 N.E.2d 86, 90-91 (1993)). In fact, those cases cited by the majority support a finding that Nash acted knowingly.
Salinas involved a drive-by shooting. Salinas, 706 N.E.2d at 383-84. The court relied on a similar drive-by shooting case and found that:
The similarities between [State v. Butticci No. 95-L-121, 1996 WL 702473 (Ohio Ct.App. November 22, 1996) ] and this case are striking. As in Butticci, the shooting took place on a January evening at approximately 8:30 to 8:40 p.m., appellant took shots at lighted residential structures, cars were parked in the driveways of these homes, and the occupants were watching television in a living room which faced the street. Moreover, appellant’s awareness of the high probability that people were in these homes is evidenced by his statement to Brian Semosky, the day following the shooting, that he hoped no one was “hit or hurt” in the shooting. Here, as in Butticci, we conclude that the evidence was sufficient to send the question of appellant’s guilt to the jury.
Id. at 389. To the extent that a drive-by shooting situation is at all relevant to the outcome in Nash’s case, Nash’s conduct presents stronger grounds for a finding of felonious assault than in Salinas. The defendant in Salinas fired shots from a car, fired those shots while at a great distance from the homes, and did not shoot at any specific area within the homes, whereas Nash fired a gun twice during a heated argument in a small house, fired the second shot in an even smaller room within the house, and fired both shots while in close proximity to no less than five of his family members.
In Owens, the defendant “claimed that he intended only to scare Kurt Ross when *771 he fired two shots at his vehicle.” 678 N.E.2d at 958. In finding that the jury’s determination that defendant acted knowingly was substantiated by the evidence, the court explained
In the case sub judice, appellant shot a gun not just once, but twice, at Ross’s moving car carrying two passengers while they were traveling on an icy expressway. Again, as we stated in the opinion, the risk of physical harm to Kurt Ross and Cynthia Combs under those circumstances was significant. In our humble opinion, the doing of an act which causes a significant risk of harm readily satisfies the required probability of harm.
Id. (emphasis added). Here, Nash too argued he only meant to “scare” his wife, but nonetheless fired the weapon twice. Moreover, while Nash might not have aimed the weapon in the direction of his wife, he fired the gun in closer proximity to a larger group of people with arguably more potential for a significant risk of harm than the defendant in Owens that fired from a moving vehicle at two victims that were also in a moving vehicle.
In Gregory, the defendant “argue[d] that the evidence showed he was drunk, that he did not hit anything, and that he did not shoot at or threaten the officers when he had a better opportunity as they were parked talking to Gates. Therefore, the evidence does not show he acted knowingly.” Gregory, 628 N.E.2d at 91. While the court rejected the defendant’s argument because he “fired multiple gunshots while pointing the gun directly at them,” it also explicitly stated that “[t]he shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that appellant acted knowingly.” Id. As discussed supra, I submit that the shooting of a gun twice in a small house during a heated argument where there is a significant risk of injury to no less than five people supports the inference that Nash acted knowingly. Nash nor the majority cites any authority that mandates otherwise.
In any event, as the government explains, there is some evidence that Nash actually fired the shot in the bedroom in his wife’s general direction. The second bullet went through the wall next to the bedroom door, and Nash’s nephew told the police that he had taken Nash’s wife from the bedroom out of the house immediately after the second shot. J.A. 423, 391-92, 598, 614 (Ex. 1K), 616 (Ex. 7G). Thus, she would have been between Nash and the door to the room. The jury was entitled to disbelieve the later trial testimony of the witnesses to the shootings given that they were all relatives of Nash that could have been trying to protect him.
Moreover, no “accident” instruction was provided to the jury here nor was there-any evidence to suggest the firearm “accidentally” discharged. See State v. Smith, No. 62427, 1993 WL 172973, *5 (Ohio Ct. App. May 10, 1993) (“An accident is defined as ‘an unfortunate event occurring casually or by chance.’ ” (citations omitted)). Rather, despite a struggle, the evidence showed that Nash pulled the trigger twice. See, e.g., J.A. 597-98 (nephew in police report explaining that “Darell Nash Sr. fire[d] shot one” and “Darell Nash Sr. fired another shot”). Indeed, during the struggle Nash’s son grabbed Nash, not the gun. See, e.g., J.A. 595, 597-98, 591. What is more, Nash admitted that when he fired the second shot the gun might have been pointed at an “angle upwards a little bit” or at least that he did not know which way it discharged. J.A. 605.
Nash’s conduct is, however, analogous to that of the defendant in Smith where the court found sufficient evidence of felonious assault. See Smith, 1993 WL 172973, at *7. In that case, the defendant “was holding a razor, which is certainly a deadly *772 weapon, when he entered the bedroom and continued to hold it during the entire altercation,” and “while [the victim] was attempting to leave the home, appellant continued to pursue him, holding the razor.” Id. In Smith, as here, the defendant contended that he was holding the weapon “as a way of letting [the victim] know he did not want him in his home and wanted him to leave”—in other words, to frighten the victim. Id. Even if Nash had not fired the gun in his wife’s general direction, and even if he had not fired it at all, the facts here would still be comparable to those in Smith; the defendant there did not slash at the victim with the razor, but simply followed the victim while carrying a deadly weapon.
Accordingly, I respectfully dissent because the district court’s grant of the writ of habeas corpus should be reversed inasmuch as the evidence was sufficient to convict Nash of felonious assault and the district court did not exercise proper deference under AEDPA.

. Indeed, guns and domestic disputes are a deadly combination:
Of females killed with a firearm, almost two-thirds were killed by their intimate partners. The number of females shot and killed by their husband or intimate partner was more than three times higher than the total number murdered by male strangers using all weapons combined in single victim/single offender incidents in 2002.
* * *
Access to firearms yields a more than fivefold increase in risk of intimate partner *769 homicide when considering other factors of abuse, according to a recent study, suggesting that abusers who possess guns tend to inflict the most severe abuse on their partners.
American Bar Association Commission on Domestic Violence, Survey of Recent Statistics (collecting sources), http://www.abanet. orgldomviollstatistics.html (last visited Dec. 5, 2007) (citations omitted).

. The majority's reliance on Green and Kline is similarly misplaced because neither involved the firing of a gun at all, let alone twice. See State v. Green, 58 Ohio St.3d 239, 569 N.E.2d 1038, 1040-41 (1991); State v. Kline, 11 Ohio App.3d 208, 464 N.E.2d 159, 165-66(1983).

. Moreover, I note that Nash threatened to kill his wife, albeit through a phone call to his son after he exited the premises. Nash called the house while the police were there, and a detective listened in while his son spoke with Nash on the phone. According to the detective, Nash stated, "[S]he did it this time. You can tell her she doesn't have a job any longer because I’m going to F'ing kill her.” State v. Nash, No.2002CA00106, 2003 WL 139783, at *1 (Ohio Ct.App. Jan. 13, 2003). While Nash's threat arguably might be more probative if the threat occurred before or contemporaneous with the shots he fired, it is some additional evidence of his intent to harm his wife.