OPINION
{¶ 1} Defendant-appellant Dennis Michael Williams ("appellant") was indicted on two counts of aggravated murder with death penalty specifications, two counts of attempted murder, two counts of felonious assault, two counts of aggravated burglary, three counts of aggravated robbery, and one count of possessing a weapon while under disability. Each charge (except the weapon possession) also included a firearm specification. Appellant was convicted of all charges.[1] He was sentenced to a total of 73 years to life in prison. He now appeals from the court's December 4, 2002 judgment entry of conviction.
 {¶ 2} Appellant sets forth two assignments of error:
I. The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.
II. The trial court erred by denying defendant-appellant's pretrial motion to suppress statement thereby violating his rights under the federal and state constitutions.
 {¶ 3} At trial, LaToya Dixon ("Dixon") testified that she invited appellant to her apartment to have sex. Appellant arrived at Dixon's apartment with "some other guys," whom she did not know. Dixon learned that appellant wanted her to have sex not only with him, but with his friends as well. While appellant and his friends were in Dixon's apartment, Dixon spoke briefly with her neighbor, Emmitt Grant ("Grant"). While Dixon and Grant were talking, appellant's friends were looking through the peephole of the apartment door. Appellant's friends asked Dixon why she was talking to Grant. She told them that Grant was "just my neighbor. He's not doing anything." (Tr. at 45.) Grant knew that Dixon did not smoke, so she asked him for a Black Mild cigar to let him know that something might be wrong. Dixon then returned to her apartment.
 {¶ 4} When Dixon returned, appellant asked his friends to leave for a while. Dixon told appellant she no longer wanted to have sex because she was uncomfortable with appellant's friends being around. Fearing trouble, Dixon left her apartment. Appellant's friends returned to Dixon's apartment as she was leaving.
 {¶ 5} As Dixon left, she saw two people near the swimming pool. She recognized Jerramie Hill ("Jerramie"), who was with his brother, John Hill, Jr. ("John"). As she was speaking with them, Dixon asked Jerramie and John to come to the other side of the apartments because she feared if they were seen talking to her there might be some type of trouble. The brothers asked her if she needed to go to their apartment, which was nearby. Dixon told them no, but also told them "Don't try to get involved in anything. Just walk back to your house." (Tr. at 447.)
 {¶ 6} Dixon testified that as Jerramie and John began to walk the short distance to their apartment, appellant and his friends suddenly confronted them. Dixon ran upstairs to her apartment but returned shortly thereafter to Jerramie and John's window, where she saw one of appellant's friends inside the apartment holding compact discs. Dixon described Jerramie and John's apartment as being "demolished," and stated that the glass was broken out of the window in which she was looking. She testified she saw blood on the bathroom wall, and that she saw the hand of one of the Hill brothers on the bathroom door.
 {¶ 7} Dixon testified she "heard a lot of beating going on * * * just like the boys was getting like stomped or something like that. * * * It sounded brutal to me. * * * Because I could hear them stomping on them, beating on them, doing whatever they was doing to them." (Tr. at 51-52.) Dixon testified that she stayed at the window and listened to the beatings for one-half hour, and then fled to a neighbor's house. (Tr. at 52-53.) Dixon later identified appellant's picture from a police photo array, but she was not able to identify any of appellant's accomplices.
 {¶ 8} Emmitt Grant lived in an apartment across from Dixon. He testified that he tried to act like a big brother towards Dixon because she was young and living alone. He testified that on the night in question he had been in his apartment all evening. Grant had had company earlier that evening, but they left at approximately 1:30 a.m. Shortly thereafter, Grant noticed that Dixon had some company arriving, none of whom he recognized.
 {¶ 9} Grant was playing a video game in his apartment. He had his front door open because it was hot. When he saw Dixon's company arriving, he closed his door. Shortly thereafter, Dixon knocked and asked for a Black and Mild cigar. As Dixon returned to her own apartment, her company opened her door, where "they was all piled up in the door and looking out." (Tr. at 84-85.) Grant exchanged greetings with Dixon's company. Grant testified that his encounter with Dixon's company was not out of the ordinary.
 {¶ 10} Grant then closed his apartment door, but shortly thereafter he opened it again. Grant said he did so because "I didn't want them to think I was scared because I closed my door. It wasn't closed before they got there. I opened up my door back up and continued to play my [video] game." (Tr. at 86.) Some minutes later, "all the guys came on the porch, and I'm hearing like a confrontation going on outside." (Tr. at 86.) Grant returned to playing his video game because "it didn't have anything to do with me." (Tr. at 87.)
 {¶ 11} Shortly thereafter, one of appellant's companions blocked Grant's doorway. Appellant then entered Grant's apartment. After a brief conversation, another one of appellant's companions ("first assailant") came into Grant's apartment and took a swing at him. Grant attempted to defend himself. While Grant was struggling with the first assailant, a gun fell to the floor out of the first assailant's clothes. Grant testified appellant picked the gun up. Grant testified a second assailant, who was not the appellant, struck him three times over the head with a table. A third assailant, who also was not the appellant, knocked over Grant's entertainment center, strewing Grant's video, television and video game equipment around the room. Grant testified that shortly thereafter, appellant grabbed a cord from a video recorder and began to strangle him. Grant testified that after he wouldn't fall, appellant told his friends, "Let's drag him to the back." (Tr. at 91.) Grant testified that he feared he would be killed.
 {¶ 12} At that point, Grant continued to struggle and escaped his assailants. He ran as far as he could and ultimately collapsed in front of an apartment door, and he asked its occupant to call the police. He remained there until the police arrived. The police officers walked Grant back to his apartment, where Grant discovered many of his personal items were missing.
 {¶ 13} Six days later, a detective from the Columbus Police Department asked Grant to come to police headquarters. The detective showed Grant a photo array and asked him if he saw any of the people who were in his apartment. Grant identified appellant and marked his picture as the "leader." He identified appellant at trial as the same person he identified in the photo array. Grant also identified photographs depicting his wounds, blood on his clothing, his missing property, and the mark of the cord that was wrapped around his neck.
 {¶ 14} Jerramie and John Hill lived in the same apartment complex as Dixon and Grant. Jerramie testified that on the night in question, he and John saw Dixon and that she appeared to be scared. As Jerramie and John began to go to their apartment, three people confronted them. The three people checked Jerramie and John to see if they had any weapons. One of the three punched John in the mouth, causing him to spit blood. John and Jerramie then entered their apartment.
 {¶ 15} Shortly thereafter, one of the assailants who just confronted them entered their apartment through a window and let the other two people in through the front door. Two of the assailants took John into the back room, and one remained with Jerramie. Jerramie tried to leave, but he was grabbed and beaten. Jerramie described being kicked, punched, hit in the head with an industrial air blower, and having people stomp on his head. The last place Jerramie remembered seeing John, was in the bedroom. At some point, Jerramie became unaware of what was happening around him because of the beating he suffered. Jerramie testified that the next thing he remembered was the arrival of the paramedics.
 {¶ 16} At trial, Jerramie identified photographs describing the condition of his apartment on the night in question. He identified items that had been taken from his apartment. Jerramie also identified photographs that depicted his injuries, including photographs that showed tread marks on his face from the bottom of one of his assailants' shoes.
 {¶ 17} Columbus Police Officer Patrick Seaman ("Seaman") testified he was dispatched on a call to the apartment complex where Dixon, Grant, and the Hills lived. Because the apartment complex is large, Seaman was having difficulty finding the specific address to which he had been dispatched. In the meantime, Seaman received another call dispatching him to a different address in the same complex. Seaman went to the second address, where he found Grant. Seaman requested a medic from the Columbus Fire Department to treat Grant's wounds.
 {¶ 18} Seaman then went on to Grant's apartment, and on the way there spotted a video game system lying on the ground. As he approached the video game, Seaman noticed an open window and an open door at the apartment that was later identified as the Hills' brothers apartment. Seaman saw a trail of blood and noted the destruction in the apartment. Seaman reached the back bedroom, where he saw both Jerramie and John. Seaman then called for other officers and medics to assist him. Seaman originally thought both Jerramie and John were dead.
 {¶ 19} Rhonda Cadwallader ("Cadwallader"), a latent fingerprint examiner for the Columbus Police Department, testified that appellant's palm print was found inside Jerramie and John's apartment. She further testified that the latent prints taken from the apartment matched appellant's known prints.
 {¶ 20} Columbus Police Detective Carl Rankin ("Rankin") was the lead detective on this incident. Rankin testified he talked to Grant the night of the incident and it was obvious Grant "had just gone through an ordeal." (Tr. at 375.) Rankin noticed several abrasions and bruises on Grant. The most significant injury Rankin noted was the linear bruising directly from ear to ear on Grant. Rankin testified that the linear bruising was consistent with a ligature mark which results from strangulation. He also testified that the ligature mark was much more pronounced in person than it appeared in the crime scene photographs.
 {¶ 21} During his investigation, Rankin "became aware of an individual by the name of Mikey," who was later determined to be the appellant. (Tr. at 380.) Rankin then prepared a photo array and showed it to Dixon and Grant separately. Dixon and Grant each identified appellant as a person who was involved in this incident. After appellant was arrested he was taken to police headquarters, where Rankin interviewed him. Appellant signed a written waiver of his constitutional rights and agreed to speak to Rankin without having a lawyer present.[2] Rankin's interview of appellant was recorded on videotape, which was played for the jury.
 {¶ 22} Appellant admitted being present at both the Hill and Grant apartments. Appellant stated he first went to Dixon's apartment with some friends, under the impression that Dixon intended to have sex with all of them. After Dixon declined to do so, appellant stated that one of his friends came into Dixon's apartment and told him that some "dude out here talking crazy. Man, we're about to whip his * * * ass." (Tr. at 407.) Appellant stated that he then joined his friends on the porch.
 {¶ 23} Appellant stated that Grant was "talking shit" while he was sitting on his couch in his apartment playing a video game, and that he and his friends "run in there, rough him up." (Tr. at 408.)
 {¶ 24} Appellant denied taking any property from Grant's apartment. Appellant said that Rankin had the wrong man, and that Rankin should be talking to Gerald Brown. Appellant denied using any weapons, and specifically denied picking up a gun or that a gun was even present.
 {¶ 25} Appellant stated that Grant left his apartment, so appellant and his friends also left. On their way down the stairs from Grant's apartment, "there goes the other [people] that was talking shit right there. * * * They started running. We followed them, went in with them, whooped their ass." (Tr. at 424.) Appellant stated that he and his friends then left and returned to their cars. Appellant denied using any weapons and denied taking any possessions from either apartment.
 {¶ 26} Dr. Dorothy Dean ("Dean"), a forensic pathologist, performed an autopsy on John Hill. Dean testified that John had eight gunshot entry wounds: two in the right arm, three in the chest, and three in the right side of his back. She further testified at least two bullets went through John's lungs and heart. She also identified several fresh flesh wounds and stated the injury to his mouth was consistent with damage that a fist would cause. Dean testified John's death was caused by multiple gunshot wounds to his torso that went through his lungs and heart.
 {¶ 27} Appellant's first assignment of error contends that the evidence supporting his conviction for aggravated murder was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.[3]
 {¶ 28} "Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury." State v.Jones, Franklin App. No. 02AP-1390, 2003-Ohio-5994, citing State v.Thompkins (1997), 78 Ohio St.3d 380, 386. When an appellate court reviews whether the evidence presented at trial was, as a matter of law, sufficient to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781; State v. Williams,99 Ohio St.3d 493, 501, 2003-Ohio-4396. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact." Jones, supra, citing State v. Jenks (1991), 61 Ohio St.3d 259, 273.
 {¶ 29} Appellant contends that Grant testified that he observed appellant with a gun 30 to 45 minutes before John Hill was shot and killed. Appellant submits that this potential time frame is not sufficient for a jury to infer that appellant participated either directly or as an aider and abettor in the homicide of John Hill.
 {¶ 30} The jury heard evidence from appellant himself that he was in the Hills' apartment and that he participated in the assault on John. The jury also heard evidence that appellant's palm print was found inside the window frame of the Hills' apartment. Thus, the jury had evidence upon which it could rationally find beyond a reasonable doubt that appellant was present at the scene of the murder at some point during the evening.
 {¶ 31} Appellant told Rankin that after Grant ran out of his own apartment, appellant and his friends also ran out and went down the stairs, where they encountered Jerramie and John. Appellant told Rankin that Jerramie and John "started running. We followed them, went in with them, whooped their ass." (Tr. at 434.) The description of the scene that was presented to the jury showed that the Hills' apartment was a relatively short distance from Grant's apartment. Thus, the jury had evidence upon which it could rationally find beyond a reasonable doubt not only that appellant was present at the scene of the murder at some point during the evening, but that he was present at the scene of the murder shortly after Grant ran out of his apartment.
 {¶ 32} More importantly, the jury was not required to believe that 30 to 45 minutes elapsed from when appellant was seen with the gun until John was shot and killed, as appellant contends. Grant testified that he saw appellant pick up the gun moments before he heard someone direct that he be "taken to the back" and he summoned the energy to escape. Grant testified that he ran as far as he could until he ran out of breath and collapsed at an apartment door, where its occupant called the police. Officer Seaman testified that he was dispatched to the scene at 2:42 a.m. and that he arrived at 2:46 or 2:47 a.m. Officer Seaman did not testify that he heard any gunshots after he arrived.
 {¶ 33} Dixon testified that after appellant and his friends began to assault Jerramie and John, she went upstairs to change her clothes. Dixon then came back downstairs to the Hills' apartment where she stayed for one-half hour. However, Grant testified that he saw appellant with the gun, broke away and ran as far as he could, which is when the police were called. Therefore, the jury could determine the police were called very near to the time that appellant and his friends encountered Jerramie and John. Grant testified that the police arrived about 15 minutes later. Officer Seaman testified that he arrived at the scene four or five minutes after he got the call. John was shot between six and eight times before the police arrived. Thus, the jury had ample evidence upon which it could construct a time line much shorter than 30 to 45 minutes from the last time appellant was seen with a gun to the time John was shot to death.
 {¶ 34} A jury can convict on circumstantial evidence alone. Moreover, the circumstantial evidence does not have to exclude "every reasonable hypotheses except that of guilt." Johnson v. Coyle (2000),200 F.3d 987, 992 (applying Ohio law prohibiting murder); State v. Lott
(1990), 51 Ohio St.3d 160 (convicting defendant of aggravated murder solely on circumstantial evidence). "While inferences cannot be built on inferences, several conclusions can be drawn from the same set of facts; and a series of facts and circumstances can be used as a basis for ultimate findings." Lott, at 168, citing Hurt v. Charles J. RogersTransp. Co. (1955), 164 Ohio St. 329.
 {¶ 35} When a jury conviction is based on circumstantial evidence, an appellate court will reverse the jury's decision "only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence." State v. Graven (1978),54 Ohio St.2d 114, 119; Lott, at 168. In convicting appellant, the jury could reasonably have determined that based on the evidence before it appellant had a gun on his person, that he tried to strangle Grant until Grant escaped, that immediately after he left Grant appellant began to beat John in his own apartment, that John was found shot to death in his own apartment shortly thereafter, and that the shooting occurred between the time the police were called and the time they arrived, between five and fifteen minutes later.
 {¶ 36} The jury found that appellant acted with prior calculation and design. Appellant submits there is no evidence to suggest that John's killing was purposeful. We disagree.
 {¶ 37} Trial testimony showed that appellant and his friends had a several-minute long heated discussion on the porch of the apartment complex. Immediately after that conversation, appellant and at least three of his friends went into Grant's apartment, where they beat him severely and attempted to strangle him. Appellant picked up a gun that fell on the floor in Grant's apartment. Appellant and his friends then left Grant's apartment with the gun and went directly to the Hills' apartment, where appellant entered through the window, went to the front door and let his friends in. Appellant and two of his friends were in the back room of the Hills' apartment, where Jerramie was nearly beaten to death and where John was found dead with eight gunshot wounds. Jerramie and Grant each testified that neither of them had done anything to provoke appellant or his friends. Dixon testified she told appellant that Grant, Jerramie and John were all her neighbors and that they were not doing anything. Dixon testified she stood outside the Hills' apartment during the beating for one-half hour.
 {¶ 38} "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." State v. Cotton (1978) 56 Ohio St.2d 8, paragraph three of the syllabus; State v. Jones (2001), 91 Ohio St.3d 335, 348. The evidence clearly permitted a jury to find that John Hill's murder was purposeful.
 {¶ 39} In sum, the jury did not have to exclude any reasonable hypothesis of innocence to reach its verdict. Nor did it have to rely on the viciousness of appellant's related crimes to reach its verdict, as appellant has suggested. Nor did it have to rely on a claim that appellant was the "leader" of the assailants to reach the verdict that it reached. Grant testified appellant picked up a gun that fell to the floor in Grant's apartment. Minutes later, a person appellant had been seen beating was found dead with eight bullet entrance wounds. Though the evidence in this case is entirely circumstantial, the evidence presented permitted the jury to find appellant guilty of aggravated murder. Accordingly, we find that appellant's argument on the insufficiency of the evidence is not well taken.
 {¶ 40} Appellant also argues that his conviction for aggravated murder is against the manifest weight of the evidence. "In considering a manifest-weight claim, `the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Braden, 98 Ohio St.3d 354, 363, 2003-Ohio-1325, quoting Thompkins at 387.
 {¶ 41} Sitting as a thirteenth juror, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins,
supra. Accordingly, we find that appellant's argument on the manifest weight of the evidence is not well taken. Appellant's first assignment of error is overruled.
 {¶ 42} Appellant's second assignment of error contends that the trial court erred in denying his motion to suppress his videotaped statement. We disagree.
 {¶ 43} "At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." State v.Mills (1992), 62 Ohio St.3d 357, 366 citing State v. Fanning (1982),1 Ohio St.3d 19, 20. "Accordingly, in our review, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." State v.Williams (1993), 86 Ohio App.3d 37, 41 (citations omitted). See, also,State v. Pingor (Nov. 20, 2001), Franklin App. No. 01AP-302.
 {¶ 44} Where, as here, a person is in custody and the police wish to interrogate him or her, the Sixth Amendment to the Constitution of the United States guarantees that person "the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." Davisv. U.S. (1994), 512 U.S. 452, 457, 114 S.Ct. 2350; Miranda v. Arizona
(1966), 384 U.S. 436, 86 S.Ct. 1602. If a person waives that right, the police are free to question him or her. Davis, citing North Carolina v.Butler (1979), 441 U.S. 369, 372-376, 99 S.Ct. 1755. A person who invokes the right to counsel cannot be questioned regarding any offense unless an attorney is actually present. Id., citing Minnick v. Mississippi (1990),498 U.S. 146, 111 S.Ct. 486. However, if the reference to an attorney is ambiguous or equivocal, such "that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." (Id. at 459.) (Emphasis sic.) Indeed, Miranda
has always recognized that a person's request for counsel could be "indecisive," permitting the officer to inquire further. Miranda, supra, at 485.
 {¶ 45} When Rankin began to interview appellant, appellant first asked him "Where's the tape recorder at?" (Tr. at 395.) Rankin replied that he kept notes instead. Rankin then told appellant, "I want to go through and I want to explain some things to you. I don't want you to make any mistakes. I don't want you to say something that you might regret." Appellant interrupted and said "Hold on. Where's my lawyer?" Id. Rankin said that was what he wanted to talk to appellant about. Rankin then explained the nature of the charges against appellant, and told appellant he would like to hear appellant's side of the story. He further advised him he was going to jail that day.
 {¶ 46} At that point, appellant again said "All right. Now, where's my lawyer?" (Tr. at 398.) Rankin responded that because appellant was under arrest, Rankin had to inform appellant of his constitutional rights. Rankin then proceeded to explain to appellant each of his constitutional rights consistent with Miranda, including his right to counsel. After an extensive conversation about those rights, appellant stated that he would talk to Rankin even though no lawyer was present. Rankin reminded appellant that in order to do so, appellant would have to sign the written waiver. Appellant signed the waiver and gave a videotaped statement.
 {¶ 47} The trial court viewed the videotape, heard the arguments of the parties, and held a hearing. Appellant was questioned by his counsel and cross-examined by appellee at that hearing. The trial court then issued a written decision comparing appellant's demeanor on the witness stand with his demeanor on the videotape and ruling that appellant's statement to Rankin was voluntary.
 {¶ 48} The trial court also determined that contrary to appellant's claim he did not feel he could stop the interview, the videotape showed several instances where Rankin began to ask appellant a question, only to be told to wait so appellant could tell his story. The trial court found that appellant understood his rights and "there was no coercion, pressure, promises, or threats made to [appellant]. Further, he did not make any attempt to stop the interview nor did he request to see an attorney." (Trial Ct. Decision, May 31, 2002.) The trial court then overruled appellant's motion to suppress the statement.
 {¶ 49} Competent, credible evidence supports the trial court's findings. Our review is therefore limited to whether the proper legal standard was identified and whether it was appropriately applied.Williams, supra. The trial court correctly identified the issue: whether appellant's asking "Where's my lawyer?" constituted an unequivocal request for counsel.
 {¶ 50} In State v. Tefft (Sept. 2, 1999), Allen App. No. 1-99-35, an officer advised a person that he had a right to an attorney. The court determined that person's response, "Well, I'm going to need one", was not an unequivocal request for counsel. The Tefft court continued:
In Davis, the Court concluded the statement "Maybe I should talk to a lawyer" was not a clear and unambiguous request for an attorney. Thus, the interrogating officers were not required to terminate the questioning. Id.
Since Davis, the following statements are among those which have been considered too ambiguous or equivocal to require police to terminate questioning: "I think I need a lawyer." Henness, 79 Ohio St.3d at 63,679 N.E.2d at 696; "Maybe I want a lawyer, maybe I should talk to a lawyer"State v. Salinas, (1997) 124 Ohio App.3d 379, 706 N.E.2d 381;" I think that I would like an attorney," State v. Taylor, 1999 Ohio App. LEXIS397 (Feb. 9, 1999), Medina App. No. 2783-M, unreported; "I think I might need to talk to a lawyer," State v. Hanson (Sept. 13, 1996), Montgomery App. No. 15405, unreported: "I plead the Fifth," State v. Peterson (Oct. 14, 1996), Madison App. No. CA 96-02-010, unreported; * * * "I feel like, talk to my, have my lawyer present: and "well I mean, I'd like to have my lawyer here," State v. Stover (April 16, 1997), Lorain App. No. 94CA006461, unreported;" Do I have to hire an attorney to have him present * * *" and "maybe I need to have an attorney present," State v.Chappell (Nov. 6, 1997), Franklin App. No. 97APA04-462, unreported; "I'd rather have my attorney here if you're going to talk stuff like that * * *" State v. Mills (Nov. 24, 1997), Clermont App. No. CA96-11-098, unreported; and "Maybe I should get a lawyer," and "Do you think I should get a lawyer?"State v. Metz (April 21, 1998), Washington App. No 96 CA 48, unreported.
See, also, State v. Holman (Dec. 21, 1999), Franklin App. No. 99AP-92 (defendant's statement that he "knew it was best to have an attorney" was not unequivocal); State v. Foster (Dec. 21, 2001), Trumbull App. No. 2000-T-0033 (where defendant asked "Well, can I have a lawyer present?" was also not unequivocal).
 {¶ 51} Similarly, in this case, appellant's asking Rankin "Where's my lawyer?" is not the same as saying "I want a lawyer." It is, in and of itself, an equivocal statement. Whether Rankin as a reasonable police officer should have interpreted appellant's question as an unequivocal request for counsel requires an examination of the context in which appellant asked the question. As the trial court noted, and as appellant's testimony at the suppression hearing confirmed, he clearly understood his rights and knew that he did not have to talk without a lawyer present.
 {¶ 52} Moreover, to show that he can read and write, appellant read aloud the sentences from the rights waiver form wherein a person expressly agrees to talk to the police without having a lawyer present. Appellant commented on the gravity of the sentences he had just read aloud, asked Rankin a few more questions, agreed to talk without having a lawyer present, and signed the waiver. (Tr. at 401, 405.) There is nothing about the context in which appellant asked, "Where's my lawyer?" that would put a reasonable police officer on notice that appellant definitely wanted to have a lawyer present. Davis, at 459.
 {¶ 53} Pursuant to Davis and its progeny, we find that appellant's statement in this case was not an unequivocal request for counsel. The trial court did not err when it overruled appellant's motion to suppress his videotaped interview with officer Rankin. Accordingly, appellant's second assignment of error is overruled.
 {¶ 54} For the reasons outlined above, appellant's two assignments of error are overruled. We therefore affirm the judgment of the Franklin County Court of Common Pleas convicting appellant of aggravated murder.
Judgment affirmed.
PETREE, P.J., and DESHLER, J., concur.
DESHLER, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] With regard to the death specifications, the jury determined (1) the aggravated murder was committed during an aggravated burglary and that appellant was the principal offender; (2) the aggravated murder was committed during the aggravated robbery and that appellant was not the principal offender; and (3) the aggravated murder was part of a course of conduct involving the purposeful killing or attempt to kill two or more persons. Appellant was also convicted of all firearm specifications.
[2] The circumstances surrounding appellant's signed waiver are discussed in greater detail infra as part of appellant's second assignment of error.
[3] Appellant was indicted and convicted of two counts of aggravated murder, as charged in counts ten and eleven of the indictment. As the convictions merged for sentencing purposes, the state elected to proceed to sentencing only on count ten. Appellant's brief confines itself only to issues related to the aggravated murder convictions. App.R. 16(A). Indeed, at oral argument appellant's counsel acknowledged that sufficient evidence existed to support a conviction on the other ten charges for which appellant was convicted. Thus, we confine our analysis to counts ten and eleven of the indictment.